**Stanley S. PEARLSTEIN, Plaintiff,**

**v.**

**SCUDDER & GERMAN, a partnership, Defendant.**

**No. 62 Civ. 1383.**

United States District Court,
S. D. New York.

June 9, 1972.

See also D.C., 335 F.Supp. 83.

Stanley S. Pearlstein, pro se; Max Schorr, White Plains, N. Y., of counsel.

Hellerstein, Rosier & Rembar, by Myron S. Isaacs, New York City, for defendant.

### OPINION

BRIEANT, District Judge.

This litigation, commenced on April 5, 1962, is now before this Court pursuant to the remand of the Court of Appeals (Pearlstein v. Scudder & German, 429 F.2d 1136, decided July 2, 1970, cert. den. 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 on April 5, 1971). The directions of the Court of Appeals, found at p. 1145 of 429 F.2d are as follows:

"Accordingly we reverse and remand to the district court to determine the proper measure and amount of damages. We leave open the question whether defendant's liability for the bonds' decline in price ended when they were sold by the bank or was terminated at some earlier date."

Jurisdiction here is limited by those directions. The original trial was held in October, 1967 before Judge Cooper of this Court, without a jury. After trial, Judge Cooper granted judgment for the defendant on July 24, 1968 (295 F.Supp. 1197) which was reversed and remanded, as noted above.

Following remand, there was an exchange of letters between counsel and Judge Cooper, including a letter from plaintiff's then attorney, Joseph Tiefenbrun, stating that:

"The plaintiff intends to offer additional evidence concerning the question raised by the Court of Appeals as to the legality of the transaction because of the size of the loans, and further evidence as to the issue of damage (sic)."

Thereafter, by Memorandum filed May 6, 1971, pursuant to Rule 34 of the General Rules of this Court, and because it appeared that trial of a fact issue was required, Judge Cooper directed that this cause be placed on the General Calendar of the Court, for trial of all issues necessitated by the remand.

Plaintiff moved for a preference, and by order dated June 12, 1971, then Chief Judge Sugarman directed that the cause be placed on the calendar as a preferred cause "for the trial of only the issue remanded by the Court of Appeals."

Against this procedural background, the cause was called in on December 6, 1971 for trial before me on December 10th. Plaintiff on December 6, 1971 moved for an order requiring John H. Scudder, a resident of Brooklyn, New York, to give his deposition prior to trial and produce certain documents. The proposed deposition was denied, as seeking irrelevant material ("to acquaint plaintiff and his associate with more of Mr. Scudder's background which previ-

ious EBT's had failed to obtain due to the obfusiatory (sic) actions of Mr. Scudder and his late trial counsel.") and also because sought in violation of Rule 9(*l*) of the General Rules of this Court.

At the same time, plaintiff moved for leave to file a "Second Amended and Supplemental Complaint" by which, *inter alia,* he sought to amend his claim to seek punitive damages of $1,000,000.00 and to change the theory of his lawsuit. This branch of the motion was disposed of by my Memorandum and Order dated December 8, 1971, which is reported in 335 F.Supp. 83.

A trial of the issue of damages was held before me on December 10, 1971. Subsequently, while the exchange of briefs was pending, plaintiff, by a "Letter in Lieu of Motion" dated January 25, 1972, sought to reopen the record before me, for reargument and further testimony. Because sufficient relevant evidence exists to discharge our obligations under the remand, that motion by plaintiff is in all respects denied.[1]

As the factual background of this decade long quest for Justice is detailed in Judge Cooper's reported opinion, and the opinions of the Court of Appeals, above cited, it will not be repeated in detail. Plaintiff, an educated man, and member of the bar of this Court, and of the State of New York, was age 47 in 1961 at the time of the acts complained of. He abandoned the legal profession in 1953 to pursue his avocation, as a writer of fiction, without profit. He became a knowledgeable investor, and after about 1956, supported himself in a modest way from his investments.

Defendant is a partnership formerly engaged as a stockbroker. Plaintiff opened his account with Scudder & German on February 20, 1961. It was a cash account. (12 C.F.R. § 220.4(c).) Such a special cash account is predicated upon the investor's intention to make full payment of all securities purchased within seven days from the trade date, and not to sell any securities before payment is completed. If plaintiff had an ordinary or "regular way" account, payment would have been required within a five day period. (12 C.F.R. § 220.3(e).)

As a result of some trades not relevant to this litigation, on March 6, 1961, there remained in Pearlstein's account with Scudder & German a cash balance of $4,599.00, representing net profits from prior sales after repayment of loans. On that day, Pearlstein purchased 50 Lionel Corporation convertible debentures, each having the face value of $1,000.00, at a total price of $58,525.00, together with stock exchange commissions of $100.00, making a total cost for the bonds of $58,625.00 (Exhibit 21). He also paid accrued interest on the debentures of $985.41.

In order to pay for the Lionel debentures, Pearlstein obtained through defendant, and from a money broker, Garvin, Bantel & Co., a bank loan in the amount of $48,000.00. He also applied his aforementioned cash balance of $4,599.00.

Plaintiff was obligated to pay the additional $7,026.88 balance of the purchase price for the Lionel debentures by March 15, 1961. This was required by Regulation "T", 12 C.F.R. Part 220, § 220.4(c), promulgated under § 7(c) of the Securities Exchange Act of 1934, 15 U.S.C. § 78g(c).

Defendant, upon plaintiff's failure to pay, should have "promptly cancell[ed] or otherwise liquidate[d] the transaction or the unsettled portion thereof." Defendant did not do this. Instead, on April 5, 1961, it transferred the Lionel debentures to the lending bank. Pay-

---

1. This determination is based on all facts found by Judge Cooper not overruled by the Court of Appeals, all statements of fact accepted as valid by the Court of Appeals, and all evidence found in the record of testimony before Judge Cooper and the exhibits, as well as additional testimony and exhibits adduced before me. Some of the original exhibits were lost, probably in connection with the application for certiorari. Plaintiff's conscientious, good faith efforts to recover them were unsuccessful. No failure of proof results from such loss.

ment was not demanded by defendant of the balance due until June 8, 1961. On August 7, 1961, defendant sued plaintiff in the State court by service of a summons asserting a demand for this unpaid balance, together also with moneys due on American Machine and Foundry ("AMF") convertible debentures (*infra*). On August 9, 1961, defendant signed a stipulation of settlement and consent to judgment in the State court action, and pursuant thereto, time for payment of part of the unpaid balance was further extended by defendant. By September 20, 1961, plaintiff had paid fully for the Lionel bonds.

These bonds were sold for plaintiff's account, by a bank holding them as collateral. Sales were made in separate lots on May 11, 1962, May 18, 1962 and April 19, 1963. The amount received on sale was $33,159.14. This election to sell was made by the bank, and consented to by plaintiff.

It has previously been found as a fact that plaintiff at all times until the date of sale, had the power and ability to direct a sale of this security, and also the AMF debentures (*infra*). Defendant had the power and ability to direct a sale and the duty to do so at all times after March 15, 1961. While defendant lost physical custody of the Lionel debentures, essential to a sale of these bearer securities, on April 5, 1961, by delivering them to the lending bank, the Court of Appeals held (p. 1142 of 429 F.2d):

". . . defendant should have used its best efforts to secure the return of the [Lionel] bonds which it had improperly delivered to the banks, by replevin if necessary, and to sell them."

Plaintiff's amended and supplemental complaint claims damages in the amount of $26,487.91, together with interest, costs, attorneys' fees and an allowance

for the depreciation in the value of the dollar since 1961, all with respect to the Lionel transaction.

The transaction with respect to the AMF convertible debentures is factually similar. On March 7, 1961, plaintiff agreed with Scudder & German to buy AMF on a "when issued" basis. The parties agreed to a short sale of the AMF debentures by Scudder & German to Pearlstein, and he purchased 100 convertible debentures of AMF, not then actually issued, but being actively traded on the New York Stock Exchange, at a total price of $150,082.64 for delivery when available after issue.

These securities became available for delivery on March 23, 1961, and payment, under Regulation T, should have been made on April 4, 1961. Although payment was not made on that date, defendant made no demand until May 22, 1961. Here again, the AMF debentures found their way into the hands of a lending bank, obtained by plaintiff with the assistance of defendant, through Garvin, Bantel & Co., a money broker. The bank advanced $100,000.00 towards the price of the AMF debentures, but plaintiff never paid the balance of the price until after February 26, 1962. The AMF debentures were sold May 29, 1962 by a bank, again on plaintiff's direction or acquiescence, at a price which caused the plaintiff to suffer a net loss of $59,-000.00 on the AMF transaction. See 429 F.2d at 1139.

The Court of Appeals pinpoints the breach by defendant of its obligations under Regulation T as follows:

". . . it seems reasonably clear that defendant violated federal law when it failed in each instance to sell the bonds after several business days had expired without payment."[2] (*Pearlstein, Id.*)

2. Regulation T, 12 C.F.R. § 220.4(c) (2), promulgated under 15 U.S.C. § 78g(a), and as then in effect, read in relevant part as follows: "In case a customer purchases a security (other than an exempted security) in the special cash account and does not make full cash payment for the security within 7 days after

the date on which the security is so purchased, the creditor shall, except as provided in sub-paragraphs (3)–(7) of this paragraph, *promptly cancel or otherwise liquidate the transaction or the unsettled portion thereof.*" (Italics added.) Insofar as concerns the Lionel debentures, as to which some payment was

It was held that wilfulness on the part of defendant was not an essential element of the cause of action, and that plaintiff's claim would not be barred even if he had been *in pari delicto* with defendant, or had intentionally induced it to violate Regulation T. This conclusion was expressed succinctly (p. 1141 of 429 F.2d):

"In our view the danger of permitting a windfall to an unscrupulous investor is outweighed by the salutary policing effect which the threat of private suits for compensatory damages can have upon brokers and dealers above and beyond the threats of governmental action. . . ."

The Court of Appeals also held that the stipulations of settlement of the State court litigation on August 9, 1961 "involve the promise by defendant of a continuation of credit which was illegal under the Act."

It was accordingly held that the consent judgment entered in the New York court on February 8, 1962, pursuant to the stipulation, did not constitute a basis for the defense of *res judicata*. A fair reading of the determination by the Court of Appeals leads to the inescapable conclusion that plaintiff is entitled to have fixed and determined before me the amount of all damages proximately caused by the statutory violation. Smith v. Bear, 237 F.2d 79, 87–88 (2d Cir. 1956). This means all damages as to which no intervening cause appears.

Obviously, the only possible factors which could terminate liability at an earlier date (as contemplated by the terms of the remand) are (1) the legal duty imposed on every victim of a tort, to use his best efforts to mitigate his damages; and (2) proof of the existence of an intervening cause of the damage.

First, the effect, if any, of the extension of credit through defendant's efforts from banks obtained by Garvin, Bantel & Co. must be disposed of. The credit extended through Garvin, Bantel & Co., at defendant's instance, is a separate and distinct credit from the illegal credit extended by defendant itself in violation of Regulation T. The Garvin, Bantel loans, which the Court of Appeals suggests may be illegal (p. 1139 of 429 F.2d) are regulated by Regulation U, Rule 1(a), 12 C.F.R. § 221.1(a), 24 Fed. Reg. 3868.

Section 221.1(a) as then in effect, read as follows:

"§ 221.1 *General Rule.* (a) No bank shall make any loan secured directly or indirectly by any stock for the purpose of purchasing or carrying any stock registered on a national securities exchange (and no bank shall make any loan described in § 221.3(q) regardless of whether or not such loan is secured by any stock) in an amount exceeding the maximum loan value of the collateral, *as prescribed from time to time for stocks in § 221.4, and as determined by the bank in good faith for any collateral other than stocks.*" (Italics added.)

With minor exceptions not material here, a stockbroker was permitted to arrange a bank loan on registered bonds, debentures or securities other than stocks, in proportions higher than the margin requirements for stocks. The case of Warshow v. H. Hentz & Co., D. C., 199 F.Supp. 581, cited in fn. 3 of the majority opinion of the Court of Appeals concerns illegal credit extended to purchase stock, not bonds or debentures. This disparity, of course, made speculative trading in convertible debentures, the market price of which fluctuates usually in direct relationship to the mar-

---

made by Pearlstein, within the time period allowed, defendant probably could have complied with Regulation T by selling a part of the debentures, the "unsettled portion thereof". This issue was not urged by defendant, and I consider myself concluded by the determination of the Court of Appeals to the effect

that ". . . defendant violated federal law when it failed in each instance to sell the bonds after seven business days had expired without payment." This is taken to represent a determination that *all* of the debentures should have been sold.

ket price of the stock into which convertible, inordinately attractive.[3] These, and other convertible debentures were considered "hot" during the years in question, and the record indicates that the partners in Scudder & German had served their apprenticeship in a securities house (Glickenhaus & Lembo) which had achieved notoriety for profits earned in convertibles held by customers on high margins.

I find no violation of Regulation U under these facts. The loans were not arranged as a part of a scheme to violate Regulation T, in fact, as pointed out in Judge Friendly's dissent, the violation of Regulation T by Scudder & German was unintentional and resulted at least in part from the fact that defendant was hospitalized and his brokers wished to treat him with consideration. He was in danger of losing his leg, and indeed, his life (p. 1146 of 429 F.2d). A violation of Regulation U, by reason of the credit extended by Garvin, Bantel & Co. through defendant, if such a violation were found, would be cumulative, and at most a concurrent cause of the damage accruing after Regulation T applied.[4] To the extent that there is any issue with respect to the credit extended through Garvin, Bantel & Co., I find no liability on the part of the defendant. There is no evidence that the lending banks did not act in good faith.

Plaintiff's cause of action is to recover damages for a tort arising out of breach of a statutory duty. The theoretical basis for recovery in suits of this kind was set forth in the 1934 *ed.* of the Restatement of Torts, § 286, which read as follows:

"The violation of a legislative enactment by doing a prohibited act, or by failing to do a required act, makes the actor liable for an invasion of an interest of another if:

(a) The intent of the enactment is exclusively or in part to protect an interest of the other as an individual; and

(b) the interest invaded is one which the enactment is intended to protect; and

(c) where the enactment is intended to protect an interest from a particular hazard, the invasion of the interest results from that hazard; and

(d) the violation is a legal cause of the invasion, and the other has not so conducted himself as to disable himself from maintaining an action."

In the Second Edition of the Restatement (1965), the American Law Institute deleted subparagraph (d) *supra,* of the 1934 text which, in addition to the requirement of proximate cause, demands that plaintiff "has not so conducted himself as to disable himself from maintaining an action." The rule set forth in the 1934 version still has validity, and this defense of contributory fault has been applied in cases arising under the securities laws. See, *e. g.* Moscarelli v. Stamm, 288 F.Supp. 453, 459 (E.D.N.Y.1968) " . . . . The broker's implied civil liability is not absolute but is subject to the traditional tort concepts of causation and contributory negligence or analogous conduct."

Other decisions have used concepts approaching that of *in pari delicto* to bar recovery. See, *e. g.* Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74 (S.D. N.Y.1968), aff'd mem. 409 F.2d 1360, cert. den. 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 in which a sophisticated investor-plaintiff intentionally violated Regulation U by false representations made to the bank which the bank did not discover because of a failure to exercise the required degree of diligence. The Court rejected absolute liability on the ground that to do otherwise " . . .

---

3. Here, for example, the 5½% Lionel convertibles and the 4¼% AMF's sold for more than face value, at a time when savings accounts paid 5% interest. Both securities were subordinate to general creditors of the issuer.

4. Plaintiff suffered a loss of $3,750.00 on the AMF debentures which accrued prior to the applicable date of Regulation T and is considered non-compensable, in view of my conclusion that Regulation U was not violated.

would be to encourage rather than discourage deception on the part of investor-borrowers with resulting prejudice to the observance of the margin requirements of the Act." (pp. 89–90 of 290 F.Supp.).

It is the law of this case, under the Court of Appeals determination, that the defense of *in pari delicto* is not available to this defendant. The factual circumstances, however, surrounding defenses based on contributory fault and *in pari delicto* reenter the case in new guise on the issue of the duty to mitigate damages.

For example, knowledgeable investors will, as indicated in Judge Friendly's dissent at p. 1148, 429 F.2d ". . . be in a position to place all the risk of market fluctuations on their brokers, if only the customer's persuasion or the broker's negligence causes the latter to fail in carrying out Regulation T to the letter. Any deterrent effect . . . may well be more than offset by the inducement to violations inherent in the prospect of a free ride for the customer who, . . . is placed in the enviable position of 'heads-I-win tails-you-lose' ".

But the knowledgeable investor allowed by the decision in *Pearlstein, supra,* to enjoy this enviable position, of holding a two-headed coin, probably comes under the duty of mitigation of damages immediately, or as soon as he sees that the broker has committed the tort, and failed to sell him out as required under Regulation T. Thus, where sophistication is found, there would be no more than a few days permitted elapsed time between the failure of the broker, and impact of the consequent duty of the speculator-plaintiff to mitigate.

Clearly, such a construction placed upon the duty of mitigating damages in this case, would be unreasonable and would frustrate the desire of the majority in *Pearlstein, supra,* to permit an investor, even a knowledgeable speculator having a conscious plan to profit

from the illegal extension of credit if his securities increased in price, to mulct the broker in order to achieve the "salutary policing effect which the threat of private suits for compensatory damages can have upon brokers. . . ." (p. 1141 of 429 F.2d). This Court may not, in giving effect to the duty to mitigate damages, so frustrate the public policy declared by the Court of Appeals.

Principles affecting damages generally, and the duty to mitigate, are well known. Insofar as they concern this action, those principles do not depend on whether liability is asserted in contract or in tort. Kerr S. S. Co. v. Radio Corporation of America, 245 N.Y. 284, 157 N.E. 140 (1927); Swain v. Schieffelin, 134 N.Y. 471, 31 N.E. 1025 (1892). The law tries to award a just indemnity. United States Trust Company of New York v. O'Brien, 143 N.Y. 284, 287–288, 38 N.E. 266 (1894).

Judge Levet of this Court in Kupferman v. Consolidated Research and Mfg. Corp., (S.D.N.Y. 61 Civ. 3641, decided Dec. 19, 1962, not officially reported, see CCH Securities Law, ¶ 91,197), stated:

"The determination of the reasonable period of time after notice within which the party could have replaced himself is a question of law. Eisenberg v. Haupt, 235 App.Div. 123, 256 N.Y.Supp. 411 * * * Whenever a breach occurs, the plaintiff has the duty to mitigate the damages so far as is reasonably possible, and plaintiff may not recover those damages which accrue because of his inattention, want of care, or inexcusable neglect (citation omitted). The party breaching the contract has the burden of proving that the damages could have reasonably have been mitigated (citations omitted)."

In Norske Ameriekalinje v. Sun P. & P. Ass'n, 226 N.Y. 1, 7, 122 N.E. 463, 465 (1919) it was stated:

"The rule is of general and widespread application that one who has been injured either in his person or his prop-

erty by the wrongful act or default of another is under an obligatory duty to make a reasonable effort to minimize the damages liable to result from such injury, and that if he does not make such reasonable effort he will be debarred from recovering for those additional damages which result from such failure."

The duty to mitigate damages was viewed slightly differently by Cardozo, C. J., in McClelland v. Climax Hosiery Mills, 252 N.Y. 347, 169 N.E. 605 (1930):

"The statement is made not infrequently in treatise and decision that a servant wrongfully discharged is 'under a duty' to the master to reduce the damages, if he can . . . The servant is free to accept employment or reject it according to his uncensored pleasure. What is meant by the supposed duty is merely this: That if he unreasonably reject, he will not be heard to say that the loss of wages from then on shall be deemed the jural consequence of the earlier discharge. He has broken the chain of causation, and loss resulting to him thereafter is suffered through his own act. It is not damage that has been caused by the wrongful act of the employer."

Defendant argues that Pearlstein had the power to order the sale of the debentures any time after purchase. At one point, on March 9, 1961, he ordered a sale of a part of the securities, but they did not reach the price on which his order was conditioned. On subsequent occasions the securities sold at prices higher than plaintiff's cost, but he did not sell. Defendant had recommended against the purchase in the first instance and from time to time had recommended that plaintiff sell, but he had refused.

Judge Cooper found, and this finding was specifically affirmed by the Court of Appeals, at p. 1139 of 429 F.2d, that ". . . plaintiff's ill health did not affect his capacity to understand and evaluate his business dealings."

The import of such a finding, in the frame of reference of the duty to mitigate damages, may not be as sweeping as first appears. Plaintiff was in no sense mentally incompetent. He authorized trades, and executed documents from his hospital bed. However, his medical experiences during the times complained of were truly frightful. He suffered from severe hypertension, renal disease, and endocrine imbalance, and, in addition, was subjected to surgery on March 10, 1961, for a "false aneurism" in the femoral artery, suffered as a consequence of a prior diagnostic procedure. On April 7, 1961, he was, according to his physician, "depressed and upset", had a mild degree of high blood pressure, and was being dosed with reserpine, a tranquilizing drug which has a recognized side effect of causing or aggravating mental depression.

He was re-admitted to the hospital on April 9th and remained there until June 10, 1961. He entered in shock, as an emergency case, received blood transfusions, and underwent three major surgical procedures during the course of his hospitalization. He had arterial bleeding and a severe infection of his surgical wound. The medical experiences and history of plaintiff would have distracted and depressed the hardiest soul.

In addition to his physical infirmities, plaintiff suffered from emotional and psychological impairments; he had sought the professional assistance of a licensed psychologist and practitioner in the field of psycho-analysis (Dr. Fishman) as early as October, 1960. Professional consultation two times a week was recommended. Fishman treated plaintiff in March of 1961 because of a state of severe agitation arising out of a minor telephone argument with his physician, in connection with which Fishman found him on March 7, 1961 to be "extremely anxious, very agitated". He received further consultation for be-

ing "extremely upset and in a state of panic" because of the dispute arising out of defendant's belated attempts to recover the balance of the purchase price of the subject securities by a lawsuit in the State courts. He was "agitated, depressed, experiencing a severe agitated depression, greatly preoccupied with what was going to happen to him, generally very very upset", on August 2, 1961 when Fishman saw him professionally.

Fishman's consultations continued and Pearlstein's condition remained the same until about February, 1962.

■ A tortfeasor must accept an injured party, ill and emotionally upset to the point of requiring professional counseling, as he finds him, even with a "thin skull". Dulieu v. White & Sons, 2 K.B. 697 (1901).

To the extent that I am not precluded from so finding by any prior adjudication, I find that prior to February, 1962, plaintiff's ability to have and exercise the necessary volition to extricate himself from his problems, direct the sale of his debentures and mitigate his damages was so limited as to be practically nonexistent. During this time he possessed an almost irrational belief, characterized on the hearing before me as an "obsession" that the investments would recoup their value and he apparently was unwilling to admit the nature and extent of his bad judgment in buying these securities.

Plaintiff asserts that his physical and mental difficulties were aggravated by defendant's tortious conduct and also by its tenacious defense of this litigation. I have previously held (335 F.Supp. 83), that if true, as a matter of law, this would not be a basis for compensatory damages, and I specifically decline to find any proximate causal relationship between plaintiff's physical and mental difficulties, and defendant's tortious conduct. Those claims are nonsense.

■ Another and separate factor tends to excuse plaintiff from his duty to mitigate damages. It is axiomatic that in order to have a duty to mitigate damages, one must recognize that he has been damaged. It would have to appear that he knew, or should have known that a tort had been committed against his property, and that he had been damaged as a result of that tort in order to be placed under the duty to mitigate. So long as Pearlstein thought that defendant had not breached any duty towards him, he had reason to believe that his declining position in these securities was temporary, and a result solely of his own bad judgment, or market conditions. Under such circumstances it was reasonable to hang on to the securities with the hope that their market value would be restored.[5]

Suspecting for the first time that he had been wronged, plaintiff, on August 8, 1961, visited some unnamed official of the Securities and Exchange Commission seeking information as to his rights, without affirmative result. He visited the New York Stock Exchange, but was turned away because defendant was not a member firm. He went to the National Association of Securities Dealers, Inc. where an unnamed functionary told him, with some moral validity, that Scudder & German had treated him very well in view of his illness and had extended a kindness and courtesy to him in not selling him out and that he had no grievance.

On August 9, 1961, he signed a stipulation of settlement of his controversies with Scudder & German which he would not have done, as a knowledgeable lawyer and investor, had he known that he had this cause of action. Indeed, many members of the investment community and

---

5. In viewing plaintiff's failure to sell out sooner, we must remember that "a wisdom developed after an event, and having it and its consequences as a source, is a standard no man should be judged by." Costello v. Costello, 209 N.Y. 252, 262, 103 N.E. 148, 152.

distinguished lawyers would not have suspected that the cause of action existed at all, and probably would have held such opinion until the decision disposing of this instant litigation.[6]

Pearlstein became fully aware of his circumstances and rights, and the fact that he was the victim of a tort after February, 1962 when he consulted the law firm of Aranow, Brodsky, Bohlinger, Einhorn & Dann. That firm wrote a letter to Scudder & German which remained unanswered and thereafter on April 5, 1962, plaintiff, on their advice, initiated the instant litigation.

■ Pearlstein's knowledge that he *had been wronged did not ripen to a suf*ficient degree of certainty so as to require him to take affirmative action to mitigate his damages until about February, 1962, when the Aranow firm wrote what may be characterized as a demand letter (although only a request for a conference). He would be entitled to a reasonable time thereafter within which to make sales of the securities so as to minimize further loss.

■ Another factor bearing on the issue of the duty to mitigate damages must be observed. When defendant entered into a stipulation with plaintiff settling the State court litigation, on August 9, 1961, defendant thereby made a further extension of credit to Pearlstein until November 8, 1961, which extension of credit was further extended by defendant until February 8, 1962 (see p. 1139 of 429 F.2d.) These extensions of credit by themselves, were violative of Regulation T; they extended the previously unlawful credit. These actions, in effect, constituted an additional or continuing tort on defendant's part and, accordingly, waived any defenses based on plaintiff's failure to discharge the duty to mitigate damages, through and including February 8, 1962, the expiration date of the last extension of credit received from defendant (see p. 1139 of 429 F.2d).

■ I find that April 5, 1962 represents the last reasonable date at which such mitigation of damages should have taken place.[7]

■ No difficulty is apprehended with respect to the issue of proximate cause. The most prominent and direct cause of plaintiff's loss, of course, was a decline in the market value of the debentures, rather than the broker's extension of credit. Treating causation according to the time honored "but for" test, however, the loss would not have occurred if the defendant broker had obeyed the rule and sold out Pearlstein's account when it should have. Prosser on Torts, § 41 pp. 242–3. Thus, at the very least, the statutory breach is a concurrent cause, together with the decline in the market. See 66 Columbia Law Review, note, pp. 1462, 1471–72 (1966).

The issue of proximate cause here is analogous to that presented in actions brought under versions of the "Dram Shop Act," in force in the various states, including New York. There, it is said, ". . . controlling precedent holds that a remote proximate cause between the sale [of liquor] and injury is sufficient to impose liability upon the vendor." (Gagliardi, J., in McNally v. Addis, 65 Misc.2d 204, 317 N.Y.S.2d 157, Sup.Ct. Westchester County 1970). From a point of view of causation a broker granting prohibited credit to a speculator is *in pari materia* with one who sells intoxicants to that class of persons eloquently described in the original New York Dram Shop Act.[8]

---

6. See "Demise of *In Pari Delicto* in Private Actions Pursuant to Regulatory Schemes", 60 Calif.Law Rev. 572, 586 (1972), "*Pearlstein* considered the broker's duty of compliance dispositive and made recovery absolute."

7. This date is less than 60 days after defendant's last extension of illegal credit, and is the day on which this lawsuit commenced.

8. Section 28 of Chapter 628 of the Laws of 1857, entitled "An Act to suppress Intemperance and to regulate the sale of Intoxicating Liquors" provides: "Any person who shall sell any strong or spirituous liquors or wines to any of

The question of pre-judgment interest is presented. At all times until the demand letter in February, 1962, plaintiff was asserting his right to keep the securities. Had the debentures risen in value during that period, Scudder & German could not have recaptured the profits from plaintiff, as it was not in possession, and he could have waived the tort. Until the elapse of a reasonable time after a demand and refusal to rescind the transaction, no interest should be imposed. Here, there was no refusal, and the scope and extent of the demand made does not appear from the record. Aranow's letter is characterized as requesting a conference. At that conference presumably a demand would have been made. There was no response to the letter and indeed there is no proof as to its contents, or that it was even received. The bringing of the lawsuit, however, was clearly a demand, which was followed by a refusal.

 The claim is in the nature of "fraud." United States v. Henry's Bay View Inn, 191 F.Supp. 632 (S.D.N.Y. 1960). Interest, in the Court's discretion, shall attach to the award of damages from April 5, 1962, until the date of entry of the judgment hereon. Such interest shall be imposed at the rate of six (6%) percent per annum from April 5, 1962 through June 30, 1968; seven and one-quarter (7¼%) percent from July 1, 1968 to February 15, 1969; and thereafter to date of entry, at seven and one-half (7½%) percent. These are the rates in effect in the New York courts. This Court is not required to follow state law with respect to the rate of interest in a cause of action based solely on a federal right, but may, and here does, consider such rates a suitable guide. Collier v. Granger, 258 F.Supp. 717 (S.D.N.Y.1966); Trans World Airlines, Inc. v. Hughes, 449 F.2d 51 (2d Cir. 1971), cert. granted Hughes Tool Co. v. Trans World Airlines, Inc., 405 U.S. 915, 92 S.Ct. 960, 30 L.Ed.2d 785.

 Plaintiff's request for additional damages by reason of his legal fees is denied. There is no basis or authority under the circumstances of this case for such a remedy. In fact, the rule is otherwise. Artvale, Inc. v. Rugby Fabrics Corp., 232 F.Supp. 814 (S.D.N.Y. 1964), aff'd 363 F.2d 1002. Likewise, his desire that the damages be increased to allow for the depreciated value of the dollar, and the corresponding increase in the cost of living during the decade in which litigation has been pending is rejected. Many publicly traded securities have not appreciated during the past decade as much as money put out at six or seven percent simple interest. Some indeed have depreciated. If our nation had experienced a time of deflation, plaintiff could not have been required to give defendant a discount, so the equitable requirement of mutuality of remedy is absent. No authority is shown for such an award, and the Court believes plaintiff is adequately compensated by the damages herein assessed.

I refuse to find that either party to this litigation has unduly prolonged or delayed its disposition. The question of damages was tried in regular course following the granting of a trial preference at plaintiff's request and the delays since the December 10, 1971 trial of the issue of damages, before me have not

the individuals to whom it is declared by this act to be unlawful to make such sale, shall be liable for all damages which may be sustained in consequence for such sale, and the parties so offending may be sued in any courts of this state by any individual sustaining such injuries, or by the overseers of poor of the town where the injured party may reside, and the sum recovered shall be for the benefit of the party injured."

Those so declared included "any person guilty of habitual drunkenness", "any intoxicated person", "any Indian or apprentice . . . without the consent of his master or mistress", "any minor under the age of eighteen years without the consent of his father or mother, or guardian", "any person against whom the seller may have been notified by parent, guardian, husband or wife."

been caused exclusively by plaintiff, and to the extent that he caused them, were excusable by reason of his ill health, and the usual difficulties affecting a Pro Se litigant, insofar as concerns filing dates for briefs.

Plaintiff's damages are computed as follows:

**Lionel Debentures**

| | | |
|---|---|---|
| March 6, 1961 | — Purchased 50 Lionel convertible debentures (Exhibit 21) | $ 58,625.00 |
| March 15, 1961 | — Date on which Regulation T became applicable; these securities were worth more than the purchase price ($120.00 x 50 = $60,000.00). | |
| April 5, 1962 | — Plaintiff charged with having sold 50 Lionel convertible debentures, which in fact were sold in lots on May 11, 1962, May 18, 1962 and April 19, 1963. Mean price week ending April 6, 1962 was 95½ or | 47,750.00 |
| | Plaintiff's damages, Lionel debentures | $ 10,875.00 |

**AMF Debentures**

| | | |
|---|---|---|
| March 7, 1961 | — Purchased 100 AMF convertible debentures at 150 on a "when issued" basis, including brokerage. | $150,082.64 |
| March 23, 1961 | — AMF available for issue | |
| April 4, 1961 | — Regulation T became applicable. On this date security was quoted at mean price of $146.25, which would have been realized if defendant had sold out plaintiff. Defendant's responsibility value ($1462.50 x 100 + $82.64) | 146,332.64 |

Defendant is not chargeable with the depreciation in the price of the AMF debentures between March 7, 1961 and the date Regulation T became applicable, because such loss is not proximately caused by the breach.

| | | |
|---|---|---|
| April 5, 1962 | — Plaintiff charged with having sold 100 AMF convertible debentures which were actually sold on May 29, 1962. Mean price week ending April 6, 1962 was $105,125 or | 105,125.00 |
| | Plaintiff's damages, AMF convertible debentures | $ 39,207.64 |

**Recapitulation**

| | |
|---|---|
| Lionel convertible debentures | $ 10,875.00 |
| AMF convertible debentures | 39,207.64 |
| TOTAL DAMAGES | $ 50,082.64 |

The Clerk of this Court shall enter Judgment for $50,082.64 together with interest computed as hereinbefore directed (*supra*, p. 454) and costs, in plaintiff's favor against defendant, pursuant to Rule 58 F.R.Civ.P. Execution of the Judgment, and proceedings for its enforcement, including issuance of certified transcripts thereof, are stayed pursuant to Rule 62 F.R.C.P., for a period of ten (10) days after entry, to permit defendant to file a supersedeas bond for a further stay pending appeal.

The foregoing constitutes the findings of fact and conclusions of law of the Court, pursuant to Rule 52 F.R.C.P

So ordered.