Norman A. LANDRY, Plaintiff,
Appellant,

v.

HEMPHILL, NOYES & CO., et al.,
Defendants, Appellees.

Norman A. LANDRY, Plaintiff,
Appellee,

v.

HEMPHILL, NOYES & CO.,
Defendant, Appellant.

Nos. 71–1178, 71–1179.

United States Court of Appeals,
First Circuit.

Heard Nov. 6, 1972.

Decided Feb. 7, 1973.

Norman A. Landry, pro se.

James C. Heigham, Boston, Mass., with whom Jeffrey L. Heidt, and Choate, Hall & Stewart, Boston, Mass., were on brief, for Hemphill, Noyes & Co. et al.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

Among a plethora of other issues, this appeal presents us with a novel question concerning the limitations to be placed upon an implied private action for the violation of Regulation T of the Federal Reserve Board, promulgated pursuant to § 7 of the Securities Exchange Act, 15 U.S.C. § 78g. That question is: May a customer recover from a broker-dealer his entire market loss on a transaction which has been partially financed on credit extended by the broker-dealer in excess of the limits permitted by the regulation? After briefly summarizing the facts necessary to an understanding of the case, we shall consider that issue, and then turn to the other points which have been raised by the parties on appeal.

## I

## The Facts

The case arises from the efforts of plaintiff, Norman A. Landry, a former customer of the brokerage house of Hemphill, Noyes & Co., to recover trading and other losses sustained in his securities account with that firm between the years of 1962 and 1964. In addition to the partnership, plaintiff named as defendants Walter Winchester, the manager of the Worcester office of Hemphill, Noyes, and Phillip J. Murphy, a former salesman with that firm. The complaint upon which the action was tried set forth essentially two causes of action. First, the plaintiff alleged that a number of his losing transactions had been made on credit extended by Hemphill, Noyes in excess of the limits permitted by Regulation T. Secondly, plaintiff sought to recover commissions paid to the defendants as a result of the alleged "churning" of his account.[1] The complaint also enumerated various fraudulent practices allegedly committed by the defendants in violation of § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j, and Rule 10b–5 promulgated thereunder. The district court in effect directed a verdict for the individual defendants on the Regulation T claim, and additionally ruled that Hemphill, Noyes was entitled to recover a $9,989 debit balance existing in plaintiff's account after its liquidation in June 1964. The jury returned a verdict in excess of $50,000 against Hemphill, Noyes for its violations of Regulation T, and also found that the plaintiff was entitled to recover varying amounts from all three defendants on the churning claim. The churning verdicts were, however, set aside by the district court on defendants' motion for judgment n. o. v. Alleging numerous errors in the proceedings below, plaintiff appealed, and defendant Hemphill, Noyes countered with a cross appeal.

The evidence at trial revealed that plaintiff is a high school graduate and that he has been engaged in the insulating, painting and carpentry contracting business with his father and brother-in-law since 1946. In the early 1960's he was the president of the corporation and in that capacity earned a salary of $15,000–$25,000 a year. During the same period he derived additional income from his ownership of certain rental real estate.

Landry's first stock market transaction was executed in 1953 through a neighbor, Bernard Bagdis, and he began to do business with Hemphill, Noyes when Bagdis became associated with the firm about two years later. From the time of his initial entry into the market up until 1957 there were fifty or sixty transactions executed in Landry's account. Among these were several transactions on margin, including one short sale on which the plaintiff realized a small profit. In 1957 Landry executed a margin agreement with Hemphill, Noyes which in part provided that the firm might liquidate his account at its discretion and collect from him any remaining debit balance.

From 1957 until January 1962 plaintiff executed his orders through defendant Walter Winchester. A total of five or six transactions were effected in Landry's account during this period. In January 1962 the account was transferred to William Mitchell, another salesman with the Worcester Hemphill, Noyes office. In the same month Landry wrote a letter to the Research Department of Hemphill, Noyes in which he set forth his current stock holdings in detail and solicited advice as to fur-

---

1. "Churning" is a term used in the securities business to describe the practice whereby a broker-dealer effects transactions in an account which are excessive in light of its size and character, for his own benefit and without regard to his customer's interests. Churning may give rise to a civil cause of action under either § 10(b) or § 15(c) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78o(c). Lorenz v. Watson, 258 F.Supp. 724 (E.D. Pa.1966); Newkirk v. Hayden, Stone & Co., CCH Fed.Sec.L.Rep. ¶ 91,621 (S.D.Cal.1965).

ther investments. In this letter, he described himself as being an "investing stockholder." Landry executed a total of seven transactions through Mitchell in the months during which the latter handled his account.

In July 1962, at the suggestion of Winchester, Landry was introduced to defendant Phillip J. Murphy. At that time Murphy was not a registered representative under the Rules of the New York Stock Exchange, and did not become fully registered until November of that year. Shortly after their initial meeting, Landry transferred his account to Murphy. Plaintiff testified that he had given Murphy discretionary powers over the account and that the latter had guaranteed him a ten percent return on his investment. Murphy denied receiving discretionary powers or making any such promise.

Activity in plaintiff's account started to increase after he began doing business with Murphy. Beginning in March 1963 his transactions started to include a sizeable number of short sales. At about the same time, however, the stock market began to rise to the detriment of those holding short positions. There was conflicting testimony as to whether Murphy advised plaintiff to cover his short sales and thus limit his losses during August 1963.

At some point during January 1964 the defendants became aware that plaintiff's account was undermargined. On May 21, Hemphill, Noyes sent Landry a telegram advising him that an additional deposit of $37,000 was required, and that his account would be liquidated by selling long positions and covering shorts if payment were not made by May 25. Landry did not comply with this request for additional margin and his account was accordingly liquidated, leaving a debit balance of $9,989.58.

Eliminating the sales and cover purchases made in the course of this liquidation, there had been approximately 120 transactions effected in Landry's account between July 1962 and June 1, 1964.

It was undisputed that throughout the relevant period there were serious bookkeeping errors in plaintiff's margin account as maintained by Hemphill, Noyes. The evidence revealed that on fourteen occasions transactions were executed on margin insufficient to meet the requirements of Regulation T.[2] Twelve of these transactions resulted in a loss to the plaintiff. The undermargining of plaintiff's account was apparently due in large part to the failure of Hemphill, Noyes to "net-out," or pair-off, short sales with subsequent long purchases of the same security as required by the regulation.[3] This resulted in a situation where the defendants would pair-off a further sale of the same security with the prior purchase, thus treating it as a long transaction not requiring margin, whereas in reality the plaintiff had no existing position in the security and was therefore actually selling short. At least partially as a result of such errors, the defendant continually failed to demand the necessary cash deposits on transactions which were, for Regulation T purposes, short sales requiring margin.

While most of the transactions which violated the margin requirements were made on totally overextended credit, several involved only partial overextensions. The most important of these was a short sale of 100 shares of Xerox on June 13, 1963. On that date there was sufficient excess credit in Landry's account to properly margin a transaction involving 80 shares of that security. Nevertheless, plaintiff's expert witness included the entire transactional loss of $14,000 in his calculation of plaintiff's damages.

2. Regulation T is violated when there is insufficient excess credit in an account to properly margin a particular transaction, and the broker-dealer fails either to receive an adequate cash deposit or to liquidate a sufficient number of securities to bring the margin up to the required level within a specified number of days following the transaction. 12 C.F.R. 220.3(b), (e).

3. *See* 12 C.F.R. 220.3(g), 220.16.

Defendants requested the court to instruct the jury that, as a matter of law, plaintiff could only recover his loss on that part of a transaction which could not have been made without an illegal extension of credit. Had the court given such an instruction, plaintiff would have been limited to a twenty percent recovery on the Xerox transaction. The instruction was denied, however, and the jury's answer to Special Interrogatory No. 2 indicated that it had assessed the entire loss against Hemphill, Noyes. Defendant's subsequent motion to amend and alter judgment on these grounds was similarly denied.

## II
### Regulation T

#### A. *Partial Overextensions of Credit*

■ Arguing that no evidence was presented at trial from which the jury could reasonably conclude that defendant's partial overextension of credit was causally related to plaintiff's entire loss on the Xerox transaction, Hemphill, Noyes contends that the district court's failure to give its requested instruction was reversible error. While we are in agreement that proof of proximate cause was an indispensable part of plaintiff's burden in this case, *see, e. g.,* Junger v. Hertz, Neumark & Warner, 426 F.2d 805 (2d Cir.), cert. denied, 400 U.S. 880, 91 S.Ct. 125, 27 L.Ed.2d 118 (1970); Aubin v. H. Hentz & Co., 303 F.Supp. 1119 (S.D.Fla.1969); Moscarelli v. Stamm, 288 F.Supp. 453 (E.D.N.Y.1968), we nevertheless conclude that the measure of recovery applied by the jury was proper.

■ It is well established that a subsidiary purpose of § 7(c) of the Securities Exchange Act is to protect the small investor from the dangers of excessive trading on credit. *See, e. g.,* Remar v. Clayton Securities Corp., 81 F. Supp. 1014 (D.Mass.1949). To the extent that Regulation T accomplishes this purpose, it does so by preventing the investor from engaging in speculative securities transactions which he could not, or would not, enter if the margin requirements were complied with. Thus, in order to show that his loss on a particular transaction was caused by a broker-dealer's violation of Regulation T, the plaintiff must establish that defendant's liberal offer of credit induced him to purchase stock which he would not have otherwise acquired. *See* Note, Federal Margin Requirements as a Basis for Civil Liability, 66 Colum.L.Rev. 1462, 1466, 1471–72 (1966). The plaintiff's proof on this issue, however, must of necessity be something less than definitive. His burden will most often be met by a showing that his financial position was such that he could not, or would not have complied with a request for margin in accordance with the federal rules. Once such a showing has been made with respect to a particular transaction, however, we feel that it would place an unfair burden on the plaintiff to require that he also prove that he would not have entered a different transaction which was, in fact, not made, i. e., the one which could have been legally effected in view of the excess credit then existing in his account. The attractiveness of margin trading arises from the possibility of realizing quick profits on a relatively small capital investment. Thus, it is purely speculative to assume that, because an investor is demonstrably willing to purchase 100 shares of a security on a particular cash payment, he would make the same capital investment in anticipation of the profits on an 80 share acquisition. We therefore hold that once a Regulation T plaintiff establishes that he has been induced to enter a transaction by an illegal extension of credit, he may recover any losses sustained thereon, regardless of whether a smaller transaction in the same security would have been consistent with the margin requirements. In so holding, we resolve a highly intangible issue of proximate cause "in favor of those the statute is designed to protect." *Cf.* Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). We do not believe that our

holding will prove to be inequitable to broker-dealers, since the degree to which credit was overextended will still be relevant to the issue of whether the plaintiff would have entered the disputed transaction regardless of any Regulation T violation. Moreover, to the extent that the defendant can establish the plaintiff's determination to make some purchase or short sale of the relevant security, he will have a good defense to plaintiff's claim for his entire transactional loss.

B. *Innocent Mistakes—Actual Knowledge*

■ Defendant requested an instruction based on § 6(v) of Regulation T, 12 C.F.R. 220.6(k),[4] that it was not liable for any losses suffered by plaintiff as a result of overextensions of credit made innocently and without any purpose to violate the margin requirements. Based upon the following facts, defendant argues that the district court's refusal to give such an instruction was error.

It was established at trial that during the years in question the Worcester Hemphill, Noyes office had no margin clerk, and that all Worcester margin accounts, including the plaintiff's, were assigned to a margin clerk in the New York office, Charles Carlough. Carlough had been a reliable Hemphill, Noyes employee since 1946, but during the years 1962–64 his abilities were seriously affected by an illness which eventually culminated in his death. Defendant's violations of Regulation T were due to the serious bookkeeping errors made by Carlough in maintaining plaintiff's margin account. There was no evidence tending to show that defendant's overextensions of credit were in any way wilful, or made with fraudulent intent.

■ While § 6(v) is entitled "Innocent Mistakes," its text speaks solely in terms of a

> *"mechanical* mistake made in . . . executing a transaction, recording, determining, or calculating any loan, balance, market price, or loan value, or other similar *mechanical* mistake . . . ."* (Emphasis added.)

Thus it is clear that the section is intended to exempt from liability only computational and similar errors, and does not apply across the board to all violations made in good faith and without specific intent. The testimony of witnesses Schwartz and Lanigan clearly revealed that the errors in plaintiff's margin account were not merely computational in nature. In addition to the aforementioned failure to "net-out" transactions, these errors included the omission of a large short sale from the defendant's margin calculations, and the improper release of certain funds from plaintiff's account. Since these errors did not fall within the meaning of § 6(v), the district court properly declined to give defendant's requested instruction.[5] *Cf.* Gregory-Massari, Inc. v. Purkitt, 1 Cal.App.3d 968, 82 Cal.Rptr. 210 (Ct.App.1969).

■ Defendant also requested an instruction based on § 29(c) of the Securities Exchange Act, 15 U.S.C. § 78cc(c), which provides in relevant part:

> "Nothing in this title shall be construed (1) to affect the validity of any loan or extension of credit . . . unless at the time of the

---

4. That section reads as follows:

> "(k) *Innocent mistakes.* If any failure to comply with this part results from a mechanical mistake made in good faith in executing a transaction, recording, determining, or calculating any loan, balance, market price, or loan value, or other similar mechanical mistake, the creditor shall not be deemed guilty of a violation of this part if promptly after the discovery of such mistake he takes

whatever action may be practicable in the circumstances to remedy such mistake."

5. Goldenberg v. Bache & Co., 270 F.2d 675 (5th Cir. 1959), the only case cited by defendant, was decided under an earlier version of the regulation which omitted the word "mechanical," and is therefore not relevant here. *See* 270 F.2d at 678, n. 3.

making of such loan or extension of credit . . . the person making such loan or extension of credit . . . shall have actual knowledge of facts by reason of which the making of such loan or extension of credit . . . is a violation of the provisions of this title or any rule or regulation thereunder. . . . "

Since the defendant was fully aware of all the transactions which took place in plaintiff's account, it had actual knowledge of facts which, upon reasonable inquiry, would have clearly revealed its violations of Regulation T. The requested instruction was therefore properly denied.

## C. Defendant's Counterclaim

■ As discussed in Part I, supra, the district court in effect directed a verdict for defendant on its counterclaim for the debit balance existing in plaintiff's account after it was closed out in June 1964. The counterclaim was based on a provision in Landry's margin agreement with Hemphill, Noyes by which the plaintiff agreed to pay any deficiency resulting from such a liquidation. Plaintiff appeals from the district court's action on the grounds that, in view of defendant's violations of Regulation T, its rights under the margin agreement were voided by § 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc(b).[6] Leaving aside the question of whether the margin agreement or its performance involved a violation of the Act within the meaning of that section, we find plaintiff's argument to be wholly unsupportable in the present context.

In calculating his damages on the Regulation T claim, plaintiff included the losses sustained on transactions made by the defendant in liquidating his account. Since these transactions resulted in the final deficiency, disallowing the counterclaim, while permitting an award of damages for the Regulation T losses, would in effect grant a double recovery to the plaintiff. Double recoveries of this nature are clearly prohibited by § 28(a) of the Securities Exchange Act, 15 U.S.C. § 78bb(a).[7]

## D. Method of Calculating Plaintiff's Loss

■ Plaintiff also appeals from the district court's ruling as to the method by which his damages under Regulation T were to be calculated. The court ordered that the losses be computed on a "netting-out" basis, i. e., by pairing a short sale with the first purchase of the same security effected thereafter.[8] Plaintiff argues, however, that since the defendant did not, in fact, "net-out" transactions in this manner, his losses should be determined by using the transactional pairings which appear in his monthly statements. Upon examination, plaintiff's reason for preferring this method of calculation becomes immediately apparent. Simplifying the facts to some degree, a typical series of transactions on which the plaintiff lost money conformed to the following pattern. Plaintiff would sell a particular security short, followed by a purchase and further sale of the same security, leaving him with a net short position which would then be eliminated by a cover pur-

---

6. Section 29(b) of the Securities Exchange Act provides in relevant part: "Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in

the performance of any such contract, . . . ."

7. That section provides in pertinent part: ". . ., but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of . . . . "

8. As discussed in Part I, supra, "netting-out" is required for purposes of Regulation T.

chase. Due to its erroneous bookkeeping, the defendant paired the first transaction with the fourth, and the second with the third, instead of following the netting-out principles prescribed by Regulation T. Because the market was continually rising, however, defendant's accounting procedures had the effect of showing a greater paper loss to plaintiff than he actually sustained, since during the period between the second and third transactions he had no net position in the security, and was thus immune to any rise or decline in its price. It is these so-called "losses" which plaintiff now argues he was entitled to recover. Regardless of the figures shown on the monthly statements, the district court was clearly correct in refusing to allow so inequitable a result. Defendant's failure to net-out transactions was significant only in regard to the role which such errors played in the undermargining of plaintiff's account; it did not operate to estop defendant from showing that a portion of plaintiff's claimed damages was purely imaginary.

### E. *Dismissal of Individual Defendants*

Since defendants Winchester and Murphy were not personally responsible for maintaining plaintiff's margin account, and since there was no evidence to show that they had actual knowledge of any violations of Regulation T, the district court did not err in dismissing the claim against these defendants.

### III

### Churning

We now turn to plaintiff's contention that the district court erred in granting defendants' motion for judgment n. o. v. on his churning claim. While we accept the jury's apparent conclusion that defendants exercised the necessary control over plaintiff's account, we are nevertheless convinced that there was insufficient evidence to support a finding that the account had been overtraded. We therefore affirm the decision below on this issue.

The desultory bits of evidence upon which the churning claim was based may be summarized very briefly. First, in January 1962 plaintiff wrote a letter to the Hemphill, Noyes Research Department in which he described himself as an "investing stockholder." Secondly, although plaintiff made only five or six transactions between 1957 and January 1962, volume in his account increased to approximately 120 transactions during the period here in question.[9] Most of these transactions were either margin purchases or short sales, and were therefore speculative in nature. While this evidence might suffice to support a churning verdict had it been established that plaintiff's investment aims were solely related to the production of dividend income and the conservation of principal, we think it to be irrefutable that, notwithstanding his January 1962 letter, plaintiff's holdings with Hemphill, Noyes assumed the character of a trading account shortly after July of that year. We base this conclusion on plaintiff's uncomplaining acceptance of what was done for him by defendants over a twenty-two month period. It was uncontroverted that Landry regularly received confirmation slips and monthly statements from Hemphill, Noyes setting forth the full details of every transaction entered, and that with one minor exception relating to a mistaken transaction in April 1963, he at no time registered any complaints with the defendants concerning the manner in which his account was being handled. Given plaintiff's obvious experience in the stock market,[10] we hold as a matter

---

9. This figure does not include the close-out transactions occurring on June 1, 1964.

10. Among other indications of plaintiff's sophistication in securities matters, the record reveals that he had been trading on margin since the 1950's and had made a profitable short sale in 1955; that he

subscribed to various financial publications such as *Barron's* and the *Wall Street Journal*; that in 1962 he solicited investment advice from the Research Department of Hemphill, Noyes and from Babson's Institute; and that plaintiff used his retained confirmation slips to pre-

of law that he must have realized the inconsistency between his alleged investment intent and what was actually occurring in his account; he is therefore estopped from arguing, for purposes of his churning claim, that he was an investor rather than a trader. *See* Hecht v. Harris, Upham & Co., 283 F. Supp. 417, 428–431 (N.D.Cal.1968), aff'd, 430 F.2d 1202 (9th Cir. 1970); *cf.* Walter S. Grubbs, 28 SEC 323, 329 (1948).

In light of the fact that a greater volume of activity will normally be expected in a trading account, *see* Note, Churning by Securities Dealers, 80 Harv.L.Rev. 869, 875 (1967), the paucity of evidence offered by the plaintiff on this issue becomes particularly striking. No expert testimony was introduced as to the turnover rate of plaintiff's account,[11] the percentage of transactions which were reversed within a short period of time, the proportion of defendants' profits attributable to commissions paid by plaintiff, or the volume of activity which would be considered normal in an account such as plaintiff's. *See* Note, Churning by Securities Dealers, *supra,* at 875–878. Instead, the jury was merely presented with the raw data concerning plaintiff's transactions, and then asked to conclude that the trading in his account had been "excessive." Under these circumstances, the court below had no alternative but to grant defendants' motion for judgment n. o. v.

## IV

 Separate Claim Form for Fraudulent Practices

Plaintiff contends that the district court erred in failing to submit to the jury a separate claim form with respect to certain allegedly fraudulent practices committed by the defendants in violation of § 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder. Along with other examples of defendants' supposedly fraudulent conduct which we do not find worthy of mention, this objection is based upon defendant Murphy's alleged guarantee of a ten percent return on plaintiff's investment. Since plaintiff made no attempt to establish the relationship of this guarantee to any of his specific losses, the district court acted properly in refusing to submit this claim to the jury.

We have carefully considered the numerous other contentions raised by the parties, which we reject without discussion.

Affirmed.

---

pare a detailed list of his current stock holdings for defendant Murphy, including calculations of profits and losses on various transactions. In view of these facts, we feel that it would stretch credulity too far to say that plaintiff was unaware that the large number of margin purchases and short sales being effected in his account were inconsistent with the aims of an "investing stockholder."

11. The turnover rate in an account is generally computed by dividing the cost of all transactions made in the account during the period under consideration by the average investment. The average investment is determined by dividing the cumulative total of the net investment at the end of each month by the number of months involved. *See* Note, Churning by Securities Dealers, *supra* at 875.