Stanley S. PEARLSTEIN, Plaintiff-Appellee and Cross-Appellant,

v.

SCUDDER & GERMAN, a partnership, Defendant-Appellant and Cross-Appellee.

Nos. 1, 2, Dockets 72–1984, 72–2001.

United States Court of Appeals, Second Circuit.

Argued Nov. 3, 1975.

Decided Dec. 24, 1975.

Stanley S. Pearlstein, pro se.

Myron S. Isaacs, New York City (Hellerstein, Rosier & Rembar, Frank R. Curtis, New York City, of counsel), for defendant-appellant and cross-appellee.

Before HAYS, MULLIGAN and MESKILL, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal by defendant Scudder & German (S & G), a partnership, from a judgment of the United States District Court for the Southern District of New York, Hon. Charles L. Brieant, Jr., which directed S & G to pay plaintiff Stanley S. Pearlstein (Pearlstein) the sum of $50,082.64, plus interest from April 5, 1962 in the amount of $33,-477.04, for a total of $83,559.68, plus costs. The judgment was filed on June 12, 1972 pursuant to an opinion dated June 9, 1972 which is reported in 346 F.Supp. 443 (S.D.N.Y.1972). Plaintiff pro se cross-appeals from the denial of his "Letter Lieu Notice of Motion" treated by the court below as either a motion for a new trial (Fed.R.Civ.P. 59(b)) or as a motion to amend the findings or to make additional findings (Fed.R.Civ.P. 52). We reverse and remand the judgment appealed from by S & G and dismiss the cross-appeal by Pearlstein.

I

The facts in this case are fully set forth in the previous opinions of this court, *Pearlstein v. Scudder & German,* 429 F.2d 1136 (1970), cert. denied, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971) and are restated here only insofar as relevant to a resolution of the issue before us.

Regulation T of the Federal Reserve System, 12 C.F.R. § 220.4(c)(2), promulgated pursuant to 15 U.S.C. § 78g(a),[1]

provided at the time of the events in issue:

In case a customer purchases a security (other than an exempted security) in the special cash account and does not make full cash payment for the security within 7 days after the date on which the security is so purchased, the creditor shall, except as provided in sub-paragraphs (3)–(7) of this paragraph, promptly cancel or otherwise liquidate the transaction or the unsettled portion thereof.

The terms of this regulation govern the two transactions here involved, each of which is set out separately below.

On March 6, 1961 Pearlstein bought fifty convertible bonds of the Lionel Corporation (Lionel) for $59,625.41 despite S & G's recommendation to the contrary. Financing consisted of a cash payment of $4,598.53 and a $48,000 bank loan, leaving a balance of $7,026.88. Regulation T required full payment on March 15, 1961, seven business days after the date of purchase, or cancellation by S & G of the transaction or its unsettled portion. S & G refrained from pursuing this course of action in view of plaintiff's desire to retain the bonds and also because of his hospitalization which continued intermittently from March 8 to June 10. On April 5, S & G transferred the Lionel bonds to Pearlstein's bank and received the $48,000 loan proceeds. No longer content to tolerate Pearlstein's delay in making final payment, S & G instituted proceedings in the state court on August 7, 1961 to collect the balance due. A stipulation of settlement in the suit was signed on August 9 which obligated Pearlstein to extinguish the balance by two installment payments on August 11 and September 15. The

---

1. Section 7(c) of the Securities Exchange Act of 1934, 15 U.S.C. § 78g(c) provides:

(c) It shall be unlawful for any member of a national securities exchange or any broker or dealer, directly or indirectly, to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—

(1) on any security (other than an exempted security), in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe under subsections (a) and (b) of this section.

first installment was timely paid, and the second was made on September 20, 1961. The illegal extension of credit on the Lionel bonds was thus terminated on that date.

The second transaction involved Pearlstein's purchase of 100 convertible bonds of the American Machine and Foundry Company (AMF) on March 7, 1961, again contrary to the advice of S & G. These were purchased on a when-issued basis from S & G as dealer for $150,082.64. The bonds were made available for distribution on March 23, 1961, thus requiring payment in full under Regulation T by April 4. Here again, plaintiff's hospitalization and subsequent failure to comply with S & G's requests for payment resulted in a failure to even partially reduce the amount due on this purchase for several months. On August 9, 1961, Pearlstein signed an agreement for payment on the AMF bonds. Pursuant thereto, he paid $25,000 on August 11, and borrowed $100,000 from a bank on August 21. The final $25,000 was due on November 9, but Pearlstein requested yet another extension. S & G brought suit in the state court on November 8, 1961 for this balance, and the litigation once again was concluded by a stipulation of settlement which required payment in full by February 8, 1962. Pearlstein also signed a confession of judgment for the debt owed. On February 8, Pearlstein had only paid $2,500 and his request for additional time was refused. On February 26, judgment for S & G was entered in the amount of $22,713 pursuant to the settlement stipulation. Plaintiff subsequently paid the amount of the judgment.

The Lionel bonds purchased for $59,625 on March 6, 1961, were ultimately sold by a bank for Pearlstein's account in separate lots on May 11, 1962, May 18, 1962 and April 19, 1963 for a total amount of $33,195.14 giving Pearlstein a loss of some $26,430. The AMF bonds purchased on March 7, 1961 for $150,082.64 were sold on May 29, 1962 by a bank for plaintiff's account for $91,000 causing Pearlstein a net loss of some $59,000.

On April 5, 1962, Pearlstein commenced an action in the Southern District of New York seeking rescission of the two purchases of convertible bonds. On September 23, 1964, he filed an amended and supplemental complaint for damages. Judge Cooper, in an opinion reported at 295 F.Supp. 1197 (S.D.N.Y. 1968), held that suit was barred by the stipulations of settlement as well as the confession of judgment entered in the state court. This court reversed, 429 F.2d 1136, holding that Pearlstein had a cause of action against S & G for its violation of section 7(c) of the Exchange Act and Regulation T even though he had been advised against making the investments and had himself urged the unlawful extension of credit. This court remanded to the district court to determine the proper measure and amount of damages. No principle in aid of that determination was suggested and the majority explicitly left open the question whether the defendant's liability for the bonds' decline in price ended when they were sold by the bank or at some earlier date.

Judge Friendly dissented, finding that section 7(c) and Regulation T conferred upon a customer no civil action for damages on the facts of this case. He pointed out that the majority holding would place a speculator in a position to place all the risk of market fluctuation on the broker. He also indicated that although the majority had suggested no damages principle to be applied by the court on remand, defendant's liability for the depreciation of the Lionel bonds should cease after it had been fully paid although an earlier cut-off might be appropriate even on the majority's view. 429 F.2d at 1146–47 n. 3.[2] The court below was thus left in the unenviable

2. Four members of this court dissented from the August 24, 1970 order denying a rehearing en banc, and three Justices dissented from the Supreme Court's denial of certiorari on April 5, 1971. 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550.

position of fashioning a damages rule in unprecedented circumstances.[3]

## II

The court below analogized the liability of the broker here to that of the seller of intoxicating beverages to Indians, minors or habitual drunks under the Dram Shop Act. While market speculation may be addictive and a somewhat heady experience at times we do not find the comparison helpful here. The extended liability of the innkeeper was to third parties and not to his customers so that if followed literally Pearlstein would recover nothing.[4] For better or worse the law of the case would demand some liability albeit undetermined for depreciation of the bonds. We agree with the court below however that it was not required to penalize S & G for Pearlstein's entire ultimate loss which was dependent upon his choice of the time of sale. Any such rule would willy nilly make the broker the guarantor of his customer who would have nothing to lose by delaying his decision to sell. Seeking to shorten the damage period, the court below found that Pearlstein had an obligation to mitigate his loss and his failure to sell at an earlier date precluded a recovery for the full amount of the loss. The cut-off date selected below was April 5, 1962, which was the date

plaintiff brought his action in the district court, some seven months after payment in full for the Lionel bonds and almost two months after judgment was entered for the final payment of the AMF bonds.

There is no doubt but that a plaintiff who fails to avoid the consequences of a tort is disabled from recovering those damages which he could have reasonably avoided. *McClelland v. Climax Hosiery Mills*, 252 N.Y. 347, 358–59, 169 N.E. 605, 609–10 (1930); 28 Yale L.J. 827 (1919); C. McCormick, Damages 128 (1935). However, we fail to see how the principle is applicable here and how we can charge Pearlstein with any obligation to divine the course of the market at any particular time. Armed with hindsight we can now characterize the market as obviously declining, but how can we charge Pearlstein with this prescience? (See Judge Learned Hand's comment in *Callan v. Andrews*, 48 F.2d 118, 120 (2d Cir. 1931)). Certainly S & G's violation of Regulation T had nothing to do with any decision to sell or not to sell the securities in question. Pearlstein was, as found below, obsessed with the idea that the market would turn and his losses would be recouped. He was an experienced investor and no action by S & G prevented him from acting as he saw fit.[5]

---

3. We note that in our prior opinion in this case, emphasis was placed on the fact that "the federally imposed margin requirements forbid a broker to extend undue credit but do not forbid customers from accepting such credit." 429 F.2d at 1141. However, the addition of section 7(f) to the Exchange Act in 1970, 15 U.S.C. § 78g(f), as well as the promulgation by the Federal Reserve Board of Regulation X, 12 C.F.R. § 224 (1975), have now made it unlawful to *obtain* credit in violation of the margin requirements. The effect of these developments is to cast doubt on the continued viability of the rationale of our prior holding. *Bell v. J. D. Winer & Co.*, 392 F.Supp. 646, 652–54 (S.D.N.Y.1975). See Comment, Civil Liability for Margin Violations—The Effect of Section 7(f) and Regulation X, 43 Fordham L.Rev. 93 (1974).

4. That the intoxicated customer has no cause of action under the Dram Shop Act is noted in *McNally v. Addis*, 65 Misc.2d 204, 209, 317

N.Y.S.2d 157, 164 (Sup.Ct.1970); *Scatorchia v. Caputo*, 263 App.Div. 304, 305, 32 N.Y.S.2d 532, 533 (1st Dep't 1942).

In sustaining the constitutionality of New York's first Dram Shop Act, the New York Court of Appeals observed that it "creates a right of action and imposes a liability not known to the common law." *Bertholf v. O'Reilly*, 74 N.Y. 509, 524 (1878). Such statutes are legislative extensions of the doctrine of strict liability. W. Prosser, Torts 538 (4th ed. 1971).

5. In any event, we could not agree with the court below that Pearlstein's obligation to mitigate damages was excused by his physical and psychological afflictions between March, 1961 and February, 1962. Certainly his claim that they were created or exacerbated by S & G's efforts to get full payment was properly characterized below as "nonsense," 346 F.Supp. at 452. Aside from this, Judge Cooper's finding that Pearlstein's ill health did not

By the same token, just as it is unrealistic to charge Pearlstein with any obligation to sell at any particular time, it is equally unfair to charge S & G with the consequences of what developed to be poor judgment on the part of Pearlstein. The prior opinion of this court left the district court free to select a date earlier than the ultimate sale of the securities as the cut-off date for S & G's liability for the depreciation of the securities. As Judge Friendly suggested in his dissenting opinion on the remand here, there should be no liability after payment for the bonds had been received thus terminating the continuing violation of Regulation T. This date is September 20, 1961 in the case of Lionel and February 26, 1962 with respect to the AMF bonds.[6] Any later cut-off dates are purely arbitrary and bear no relationship to the regulatory violation which, as we have pointed out, never disabled Pearlstein from making any decision to sell. Since S & G was obviously making every effort to obtain payment, one might question whether the dilatory tactics of Pearlstein should not have denied him any recovery for his losses after the initial violations by S & G. (See Restatement (Second) of Torts §§ 283, 464 (1965); Restatement of Torts § 918 (1939)). Nonetheless, the law of the case would seemingly dictate that the violation was continuing and that Pearlstein's acquiescence and indeed encouragement

of the illegal extensions did not bar suit. See *Spoon v. Walston & Co.*, 478 F.2d 246 (6th Cir. 1973).

We note, however, that under the regulation S & G was not obliged to sell the entire bond purchase but only to liquidate the unsettled portion of the transaction. Hence, S & G's liability should be in the proportion that the unsettled amounts bore to the total purchase price. Thus in the case of Lionel, Pearlstein had paid $4,598.53 in cash prior to March 15, 1961; the indebtedness was further reduced by a $48,000 bank loan on April 5, 1961, $3,000 in cash on August 11, 1961 and the balance was paid on September 20, 1961. With respect to AMF, although no payment was made prior to April 4, 1961, a $25,000 payment was made on August 11, 1961, $100,000 on August 21, 1961, $2,500 by February 8, 1962 and the balance we deem paid on February 26, 1962. We agree with the court below that the damage period commenced on March 15, 1961 in the case of the Lionel bonds and April 4, 1961 for the AMF purchase. These were the dates that Regulation T came into play with respect to each security and any prior loss was not attributable to S & G. We therefore remand to the district court to compute the damages within the periods fixed and to reduce S & G's liability pro tanto as the interim payments reduced the outstanding indebtedness.[7]

---

affect his capacity "to understand and evaluate his business dealings" was specifically affirmed by this court on appeal, 429 F.2d at 1139. The fact that Pearlstein was not aware of the regulatory breach by S & G did not affect his ability to sell or not to sell.

6. Judgment was entered for the final indebtedness on the AMF bonds on February 26, 1962. The record does not indicate when the judgment was paid. We fix the date of judgment to terminate S & G's liability. Whatever delay, if any, occurred in satisfying the judgment should not benefit Pearlstein.

7. The following is provided to illustrate the measure of damages to be applied in this case. In the Lionel transaction, Pearlstein had paid $4,598.53, or approximately 8% of the purchase price, prior to March 15, 1961. S & G is

therefore liable for 92% of the bonds' decline in value between March 15 and April 5. On the latter date, S & G received the $48,000 loan proceeds which completed payment of approximately 88% of the purchase price. The partnership is therefore liable for 12% of the loss between April 5 and the date of the next installment, August 11. The percentage of the loss for which S & G is responsible is to be reduced as each successive payment was made until September 20, 1961, the date of final payment.

Since no payment was made on the AMF bonds until August 11, 1961, S & G is liable for 100% of the loss occurring between April 4 and that date. The $25,000 payment of August 11 amounted to approximately 16% of the purchase price, rendering S & G responsible for 84% of the loss between August 11 and August 21 when an additional $100,000 was

■ We cannot agree that the award of $33,477.04 in interest was appropriate here. The court below considered that the claim was in the nature of fraud. We see no warrant for this characterization. Pearlstein was an experienced and sophisticated investor who was not inveigled into the purchase or the retention of his securities. There was no debtor-creditor relationship between the parties, and in view of all the circumstances, we believe that any allowance of interest here is unwarranted. *Rodgers v. United States*, 332 U.S. 371, 373, 68 S.Ct. 5, 92 L.Ed. 3 (1947).

■ We find no merit in Pearlstein's cross-appeal. Aside from his failure to file a timely notice of appeal, the issues raised are without merit. There is certainly no basis for an award of treble damages, punitive damages or counsel fees. The cross-appeal is therefore dismissed and the judgment below is reversed and remanded for a computation of damages in accordance with this opinion.

received. The percentages are to be reduced as periodic payments were made until February 26, 1962.

The figures used here are illustrative only, and are to be computed by the district court de novo upon remand.