Raymond L. **PALMER** and Cora R. **Palmer**

v.

**THOMSON & McKINNON AUCHINCLOSS, INC.**

**Civ. No. H–74–42.**

United States District Court, D. Connecticut.

July 18, 1979.

W. Wilson Keithline, Hartford, Conn., for plaintiffs.

Ernest A. Inglis, Jr., Philip S. Walker, Day, Berry & Howard, Hartford, Conn., for defendant.

## RULING ON CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT

BLUMENFELD, District Judge.

Plaintiffs, Raymond L. and Cora R. Palmer (the Palmers) commenced this action against Thomson & McKinnon Auchincloss, Inc. (Thomson), a brokerage firm, for rescission and damages on several transactions involving the purchase and sale of securities. In a previous decision in this case, this court held that defendant Thomson violated Regulation T of the Federal Reserve Board, 12 C.F.R. § 220 et seq., and Section 7 of the Securities Exchange Act, 15 U.S.C. § 78g, and that plaintiffs could maintain a cause of action for those violations. Ruling on Cross-Motions for Summary Judgment on Count Three of plaintiffs' Complaint, *Palmer v. Thomson & McKinnon Auchincloss, Inc.*, 427 F.Supp. 915 (D.Conn. 1977). That decision left open (1) whether the defendant could maintain a valid *in pari delicto* defense, and (2) in the event that an *in pari delicto* defense was found not to exist, the measure of damages. Plaintiffs and de-fendant have moved separately pursuant to Fed.R.Civ.P. 56(c) for summary judgment on these issues, which is appropriate here since there exists no genuine issue as to any material fact on the present state of the record.

### Factual Background

Plaintiffs Raymond and Cora Palmer are a retired couple in their seventies. On March 21, 1972, they transferred their margin account with Shearson Hamill & Co., Inc. to the defendant. This transfer resulted in a deposit with the defendant of 2,500 shares of Jack Eckerd Corp. (Eckerd) and an extension of credit by defendant to plaintiffs of $30,735. The Eckerd stock then had a value of $33 per share and a total value of $82,500. The margin requirement of the Federal Reserve Board promulgated pursuant to § 220.8 of Regulation T was 55 percent. On March 21, 1972, the credit extended by the defendant to the plaintiffs was within the limits set by Regulation T.

On that date, defendant credited plaintiffs' SMA [1] in the amount of $6,390. This credit of $6,390 represented the difference between the excess loan value of the securities, $37,125, and plaintiffs' adjusted debt balance of $30,753. [2]

On March 28, 1972, the value of the Eckerd stock rose to $85,000. Forty-five percent of the $2,500 increase was credited to the Palmers' SMA ($1,125). April 5, 1972, the shares' value rose an additional $2,500 to $87,500. Again $1,125 was added to the SMA. The next day, April 6, 1972, the value of plaintiffs' securities jumped $5,000 to $92,500. Forty-five percent of this increase, or $2,250, was added to the SMA which now totaled $10,871.75. [3] By April 28, 1972, the value of plaintiffs' Eckerd stock had declined $10,000 and returned to its

---

1. The SMA is an account designed to preserve an accrued balance of cash or credit for margin customers. *See Palmer v. Thomson & McKinnon Auchincloss, supra*, 427 F.Supp. at 918.

2. With a margin requirement of 55 percent, the excess loan value of securities worth $82,500 was $37,125 (45 percent of $82,500).

3. As a result of a bookkeeping error immaterial to this action, plaintiffs' SMA was mistakenly debited $18.25.

initial worth of $82,500. No entry was made to the SMA to reflect this loss in value. In addition, a dividend of $87.41 was credited to the SMA and subtracted from the adjusted debit balance. Thus as of May 9, 1972, plaintiffs had an SMA of $10,959.26 and a debit balance of $30,839.79.

On May 9, 1972, defendant purchased 500 more shares of Eckerd stock for the plaintiffs at a cost of $16,952.75. To meet the 55 percent margin requirement of Regulation T, defendant debited plaintiffs' SMA $9,324.01 (55 percent of $16,952.75). After the purchase, plaintiffs had a debit balance of $47,792.54 ($30,839.79 + $16,952.75) and an SMA of $1,635.25 ($10,959.26 − $9,324.01). It is clear that if the SMA had been adjusted to reflect the decline in value of plaintiffs' prior holdings in Eckerd, they would not have had sufficient equity in their accounts to purchase the new shares under the 55 percent margin requirement.

Between May 9, and November 14, 1972, the only entries to plaintiffs' margin accounts consisted of interest charges of $1,782.21 and a dividend credit of $225. At plaintiffs' request, on November 15, 1972, the defendant sent plaintiffs a check for $200. This transaction was effected by reducing the SMA $200 and adding $200 to their debit balance.

Finally on November 28, 1972, defendant purchased 4,500 shares of Ward Cut-Rate Drug Co. (Ward) for plaintiffs' margin account at a cost of $111,936.60. On the same day, defendant created a "short" account for the plaintiffs and sold the 3,000 shares of Eckerd for $113,921.65.[4] In conformity with the Regulation T "same day transaction" rules, defendant did not require the deposit of any additional equity to plaintiffs' account since the shares sold had a greater market value than those purchased. As the value of their Ward shares declined, plaintiffs fell below the house maintenance margin requirements of defendant.[5] The short account was closed out March 9, 1973; the Ward shares were sold on April 24, 1973.

This court specifically held in its previous ruling that the May 9 purchase of "Eckerd" and the November 28 purchase of "Ward" were both in violation of Regulation T and Section 7 of the Securities Exchange Act. 427 F.Supp. at 924.

### In Pari Delicto Defense

The defendant argues in its motion that because both the defendant and the plaintiffs share responsibility for complying with margin regulations, and because neither party believed a violation had occurred, the parties were *in pari delicto* with respect to the violations. Plaintiffs, on the other hand, argue that although they had knowledge of the transactions involving their margin account, their reliance upon the defendant's calculations cannot support a defense based on comparative fault.

The defense of *in pari delicto* is a valid defense in a private action for violation of the Securities and Exchange Act of 1934. *Woolf v. S.D. Cohn & Company*, 515 F.2d 591, 601–03 (5th Cir. 1975), *vacated on other grounds*, 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976); *James v. DuBreuil*, 500 F.2d 155 (5th Cir. 1974); *Lantz v. Wedbush, · Noble, Cooke, Inc.*, 418 F.Supp. 653 (D.Alaska 1976); *Bell v. J.D. Winer & Co., Inc.*, 392 F.Supp. 646 (S.D.N.Y. 1975). In order to assert the defense it must be shown that the fault of the parties is "clearly mutual, simultaneous, and relatively equal" and that the plaintiff was an active,

---

4. These shares were sold "short against the box." The parties agree in their stipulation that under this procedure, "the plaintiffs' margin account continued to hold 3,000 shares of Eckerd and the defendant arranged for the plaintiffs' short account to borrow 3,000 shares of Eckerd from a third party and to sell the borrowed stock in the short account." Stipulation of Fact, n.32.

5. The Regulation T limits apply only to the initial purchase. Rule 431(b) of the Rules of the New York Stock Exchange provides that member brokers require a 25 percent "maintenance margin" of all customers. The house "maintenance margin requirement" of the defendant for shares held "long" in margin accounts was 30 percent. For stock held short against the box the house standard was only 10 percent.

essential, and knowing participant in the unlawful activity. *Woolf v. S.D. Cohn & Company, supra,* 515 F.2d at 604; *James v. DuBreuil, supra; Lantz v. Wedbush, Noble, Cooke, Inc., supra,* 418 F.Supp. at 654.[6]

From these general principles, I find that the application of the *in pari delicto* defense is inappropriate to the case at bar. The defendant is correct in its assertion that the responsibility for complying with margin regulations is shared by investors as well as brokers.[7] However, the assertion of "comparative innocence," *i. e.,* that both parties believed the transactions met Regulation T requirements, will not support the imposition of an *in pari delicto* defense.

In the cases that have upheld the defense, the plaintiffs' conduct involved active, knowing and voluntary schemes to circumvent the securities laws.[8] *See James v. DuBreuil, supra; Kuehnert v. Texstar, supra,* 412 F.2d 700; *see also Woolf v. S.D. Cohn & Company, supra; Lantz v. Wedbush, Noble, Cooke, Inc., supra.* In the instant case, the Palmers' mere acquiescence in transactions they believed legitimate cannot be characterized as active, knowing, simultaneous, and equal participation in the Regulation T violations. Thus, plaintiffs' conduct in relying on the defendant's calculations regarding margin requirements does not reach the level of culpability generally associated with an *in pari delicto* defense.

### Damages

Plaintiffs argue in their motion that the proper measure of damages is that based upon rescission, *i. e.,* to place them in the position they would have been in had the illegal transactions not been charged to their account. Under plaintiffs' theory of recovery, the entire May 9 purchase of 500 shares of Eckerd and the entire November 28 purchase of 4,500 shares of Ward would be rescinded, thereby allowing plaintiffs to recoup their losses amounting to $85,084.45 (the net value of 2,500 shares of Eckerd as

---

**6.** However, even if the above criteria are met, the application of the *in pari delicto* defense rests upon the sound discretion of the court. *James v. DuBreuil, supra,* 500 F.2d at 158; *Kuehnert v. Texstar Corp.,* 412 F.2d 700, 704 (5th Cir. 1967); *Wohl v. Blair & Co.,* 50 F.R.D. 89, 92 (S.D.N.Y. 1970), as the court noted in *Woolf v. S.D. Cohn & Company*:

"because of the two-fold purpose of the implied private rights of action that have grown up around the securities acts, deterrence of violations and compensation of those who have suffered pecuniary loss attributable to violations, the degree to which the defendant's unlawful activity affects the investing public must be given substantial weight in determining whether to permit interposition of the *in pari delicto* defense. Thus, even in a case where the fault of the plaintiff and defendant were relatively equal, simultaneous and mutual, the court might still reject the defense if it appeared that the defendant's unlawful activities were of a sort likely to have a substantial impact on the investing public, and the primary legal responsibility for and ability to control that impact is with the defendant."

515 F.2d at 604. The standard by which the district courts are to exercise their discretion in applying the defense is a question of policy, *viz.,* "which decision will have the better consequences in promoting the objectives of the securities laws by increasing the protection to be afforded the investing public." *Woolf v. S.D.*

*Cohn & Company, supra,* 515 F.2d at 602; *James v. DuBreuil, supra,* 500 F.2d at 159; *Kuehnert v. Texstar Corp., supra,* 412 F.2d at 704.

**7.** It is now generally recognized that under § 7(f) of the Securities Exchange Act, 15 U.S.C. § 78g(f), and Regulation X, 12 C.F.R. § 224, the responsibility for complying with margin regulations rests on investors as well as brokers. *See, e. g., Pearlstein v. Scudder & German,* 527 F.2d 1141, 1145 n.3 (2d Cir. 1975); *Utah State University of Agriculture & Applied Science v. Bear, Stearns & Co.,* 549 F.2d 164, 170 (10th Cir. 1977), *cert. denied,* 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977); *Drasner v. Thomson McKinnon Securities, Inc.,* 433 F.Supp. 485 (S.D.N.Y. 1977).

**8.** *See Perma Life Mufflers, Inc. v. Intern. Parts Corp.,* 392 U.S. 134, 153, 88 S.Ct. 1981, 1992, 20 L.Ed.2d 982 (1968) (Harlan, J., concurring and dissenting): "Plaintiffs who are truly *in pari delicto* are those who have themselves violated the law in cooperation with the defendant." In *Perma Life* the opinion of the Court indicated that the *in pari delicto* defense might be allowed as a defense to an antitrust action if the plaintiff was "actively supporting the entire restrictive program as such, participating in its formulation and encouraging its continuation." *Id.* at 140, 88 S.Ct. at 1985.

of November 28, 1972). Under defendant's theory of recovery, plaintiffs would be entitled to $2,444.21, the maximum loss directly attributable to 163 shares of Eckerd purchased on May 9 in violation of Regulation T. *See* Stipulation To Accuracy of Computations, II. C. 6.

In support of their argument for rescission, plaintiffs rely primarily on Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc, which provides in relevant part:

"(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void . . . ."

Plaintiffs do not allege here that the standard customer's agreement they entered into was violative of the Securities Exchange Act. Instead, they argue that Section 29(b) should not only apply to the basic contract between the parties but also to each transaction that occurs thereunder. Plaintiffs argue that each transaction should be considered a separate contract for purposes of Section 29(b).

██ Section 29(b) authorizes rescission of unlawful contracts, not unlawful transactions that were consummated under lawful agreements. *See Drasner v. Thomson, McKinnon Securities, Inc.,* 433 F.Supp. 485 (S.D.N.Y. 1977). As Judge Pollack noted in *Drasner*:

"This subsection [Section 29(b)] only renders void those contracts which by their terms violate the Act or the rules and regulations thereunder, *Billings Associates, Inc. v. Bashaw,* 27 A.D.2d 124, 276 N.Y.S.2d 446 (4th Dep't 1967); *Gregory-Massari, Inc. v. Purkitt,* 1 Cal.App.3d 968, 82 Cal.Rptr. 210 (1969); *Pearlstein v. Scudder & German,* 429 F.2d 1136, 1149 (2d Cir. 1970) (Friendly J., dissenting), *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1250,

28 L.Ed.2d 550 (1971) for it is only such contracts which are 'made in violation of,' or 'the performance of which involves the violation of' the statute and the rules and regulations thereunder.

. . . . .

"Thus even if there were a violation of Regulation T in this case, the option contracts which plaintiffs seek to rescind were governed by a valid contract . . . whose terms do not violate the Act or any regulations thereunder."

*Id.* at 501–02. Similarly Judge Friendly suggested in his dissenting opinion in *Pearlstein v. Scudder & German,* 429 F.2d 1136 (2d Cir. 1970) that:

"Despite the Draconian language, § 29(b) does not provide a pat legislative formula for solving every case in which a contract and a violation concur. Rather it was a legislative direction to apply common-law principles of illegal bargain, enacted at a time when it seemed much more likely than it might now that courts would fail to do this without explicit legislative instruction. *See D.R. Wilder Manufacturing Co. v. Corn Products Refining Co.,* 236 U.S. 165, 174–75, 35 S.Ct. 398, 59 L.Ed. 520 (1915). There has been a conspicuous lack of judicial enthusiasm for the doctrine thus incorporated when there has been performance by the violator; the reasons are clearly set forth in *Bruce's Juices, Inc. v. American Can Co.,* 330 U.S. 743, 752–757, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947), and *Kelly v. Kosuga,* 358 U.S. 516, 519–21, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959)."

*Id.* at 1149. *See also Newman v. Pershing & Co., Inc.,* 412 F.Supp. 463, 467 (S.D.N.Y. 1975).

Plaintiffs do not cite any Second Circuit authority that recognizes rescission as the appropriate measure of damages in cases of this type. Instead, they rely on *Landry v. Hemphill, Noyes & Co.,* 473 F.2d 365 (1st Cir. 1973) in support of their contention. That case is distinguishable on several grounds.

First, the result reached by the court in *Landry* was premised on the fact that the broker was solely responsible for complying with margin regulations. However the Regulation T violation at issue there occurred prior to the enactment of Section 7(f) and the adoption of Regulation X, which placed responsibility for complying with margin regulations on investors as well as brokers.[9] Second, the court ruled that in order to obtain rescission "the plaintiff must establish that the defendant's liberal offer of credit induced him to purchase stock which he would not have otherwise acquired." *Id.* at 370. Plaintiffs do not allege nor do the facts indicate that in the case at bar the Palmers were induced to purchase the Eckerd stock by the defendant's offer of credit. Third, the court indicated that the degree to which credit was overextended would be relevant in order to avoid inequitable results, *e. g.*, allowing rescission when only a de minimis amount of credit is overextended. *See id.* at 371.

Nevertheless, plaintiffs argue that in *Landry* only 20 percent of the transaction was illegal and the entire transaction was rescinded. In the instant case, 163 of the 500 shares purchased on May 9 exceeded margin requirements, *i. e.*, 32.6 percent of the transaction was illegal. Clearly, plaintiffs conclude, if full rescission was granted in a 20 percent illegal transaction it should be allowed where 32.6 percent of the transaction is illegal.

Plaintiffs' application of percentages is misleading. It is true that 32.6 percent of the May 9 transaction was illegal. However, plaintiffs' suggested amount of damages, $85,084.45, is not derived from the losses attributable to the initial May 9 purchase of the additional 500 shares, but from losses attributable to all transactions that involved the "tainted" shares. As is indicated in the Stipulation To Accuracy of Computations, II. C. 5., only 3.75 percent of Palmers' total loss is directly attributable to the initial violation.

■ On November 28, 1972, when plaintiffs traded their 3,000 shares of Eckerd stock, then valued at $113,921.95, for 4,500 shares of Ward stock, the Ward stock was valued at $111,936.60. Subsequently the Ward shares declined in market value and were sold on April 24, 1973 for $46,757.75. Plaintiffs seek to recoup this entire $65,178.85 loss in stock market value of the Ward shares by rescinding the November 28 transactions merely because 163 of the 3,000 shares of Eckerd stock involved in the exchange had been purchased in violation of Regulation T. Thus, to award such damages would amount to full recovery on all losses sustained including those suffered which are not directly attributable to the Regulation T violation. Such a measure of damages would lead to inequitable results and is therefore unacceptable.

■ Defendant Thomson argues in its motion that plaintiffs are entitled to recover only that portion of their loss which is directly attributable to the Regulation T violation. In *Pearlstein v. Scudder & German*, 527 F.2d 1141 (2d Cir. 1975) (*Pearlstein II*) this "allocation theory" is developed. In *Pearlstein*, the defendant broker executed two purchases of convertible bonds for the plaintiff. The plaintiff failed to make full payment to the broker within seven business days, as required under Regulation T. The broker then failed to liquidate the unsettled portion of each transaction as also required under the Regulation. Plaintiff later sold the bonds at a substantial loss and argued that the broker should compensate him for that loss. The court disagreed and held that:

> "under the regulation [defendant] S & G was not obliged to sell the entire bond purchase but only to liquidate the unsettled portion of the transaction. Hence, S & G's liability should be in the proportion that the unsettled amounts bore to the total purchase price."

*Id.* at 1146.

In *Gutter v. Merrill Lynch, Pierce, Fenner and Smith*, [1977–1978 Transfer Binders] Fed.Sec.L.Rep. (CCH)¶ 96,239 (S.D.Ohio

9. *See* note 7 *supra*.

1977), a broker had improperly applied value in the plaintiff's Special Bound Account as collateral for stock purchases made for the plaintiff's general account. The plaintiff sought rescission and damages. The court held that:

"Plaintiff is entitled to recover only that loss which resulted from defendant's failing to effect liquidating transactions to the extent required by Section 220.3(e). Since there were doubtless other securities in plaintiff's general account whose loan value would have reduced the amount of resulting short-fall, and therefore the amount of necessary liquidation, the breakdown in plaintiff's complaint is incomplete. Further evidence is required in order to determine the exact amount of securities which would have had to have been sold or repurchased in order to comply with Regulation T."

*Id.* at 92,616.

This court agrees with the defendant that allocation of the loss to the Regulation T violation is the correct measure of computing damages in this case. Under the "allocation theory" plaintiffs are entitled to those losses which are directly attributable to defendant's Regulation T violations. To determine the amount of those losses the chain of causation proceeds as follows.

From the Stipulation of Fact filed with this court, the Palmers' maximum loss on the November 28, 1972 transaction, computed by subtracting the net price of the Ward shares sold on April 24, 1973 from the total cost of the same shares when purchased on November 28, 1972, was $65,178.85 ($111,-936.60 − $46,757.75). Of the 500 shares of Eckerd purchased for the Palmers' account on May 9, 1972, only 163 shares were actually purchased with "illusory" SMA credit.[10] Following the reasoning of *Pearlstein II* and *Gutter*, Thomson was required (under

§ 3(e) of Regulation T, 12 C.F.R. § 220.3(e)) to liquidate only those 163 "tainted" shares (the "unsettled" portion of the May 9 transaction). The Palmers are therefore entitled to recover only that portion of their loss on the May 9 and November 28 transactions which resulted from Thomson's failure to sell those shares within five business days after May 9 as required by Regulation T.

The 163 shares of Eckerd purchased on May 9 with "illusory" SMA credit constituted 5.43 percent of the 3,000 shares of Eckerd which were sold for the Palmers' account on November 28, 1972. Thus, only 5.43 percent of the net price of the 3,000 Eckerd shares sold on November 28, or $6,185.97, was directly attributable to Thomson's possible Regulation T violation on May 9. The remaining 94.57 percent of the net price of the Eckerd shares sold on November 28, or $107,735.98, was attributable to the sale of stock (2,500 + 337 = 2837) which had been properly purchased in full compliance with Regulation T. This $107,735.98 was properly used by Thomson in the purchase of 4,500 shares of Ward for the Palmers' account on the same date.

The total cost to the Palmers of the 4,500 Ward shares purchased on November 28 was $111,935.60. Of this amount, only $4,200.62 ($111,935.60–$107,735.98) can be directly traced to the Regulation T violation on May 9. In other words, only about $4,200 of the total price of the Ward shares was derived from the May 9 purchase of Eckerd shares with "illusory" SMA credit.

The percentage, as opposed to the dollar amount, of the price of the Ward shares purchased on November 28 which can be directly ascribed to the use of "improperly maintained" SMA credit is 3.75 percent ($4,200.62 ÷ $111,936.60). Thus, only 3.75 percent of the Palmers' loss on the sale of

---

10. The excess of the loan value of the Palmers' margin equity securities could properly be used in the purchase of additional securities for the Palmers' margin account. On May 9, 1972, the excess loan value of the Palmers' margin equity securities was $6,285.21. Since the margin requirement as of that date was 55 percent, the Palmers could properly have purchased $11,-

427.66 worth of Eckerd stock ($6,285.21 ÷ 55 percent), or 337 shares at $33.91 per share (cost per share = $16,952.75 ÷ 500). Thus, only the remaining 163 shares of Eckerd which the Palmers purchased on May 9, 1972 were purchased with credit which this court has held to have been improperly maintained in the Palmers' SMA.

their Ward shares on April 24, 1973 is directly attributable to the possible Regulation T violations on May 9, 1972. This percentage amounts to $2,444.21 ($65,178.85 × 3.75 percent). This is the amount of damages to which the plaintiffs are entitled.

 Plaintiffs' claim for prejudgment interest is denied. The award of prejudgment interest is left to the discretion of the court, to be decided by balancing the equities and weighing notions of fairness to the parties. *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 384 F.Supp. 507, 527 (S.D.N.Y. 1974), *affirmed on this point*, 516 F.2d 172, 190–91 (2d Cir. 1975). *See also Pearlstein, supra*, 527 F.2d at 1147. There has been no allegation of fraud or serious misconduct on the part of the defendant. Both plaintiffs and defendant claim, and it is not disputed, that they were unaware that any violations had occurred. An award of prejudgment interest in this case would be contrary to notions of equity and fairness.

In conclusion, plaintiffs' motion for summary judgment on the issue of the *in pari· delicto* defense to Count Three is granted. Defendant's motion for summary judgment on the issue of damages under Count Three is granted. I find that there is no just reason for delay and direct that judgment be entered for plaintiffs to recover the amount of $2,444.21 from the defendant. *See* Rule 54(b), Fed.R.Civ.P.

SO ORDERED.