**In re Donald F. SCHROUD, Bankrupt.**

**Allan COHEN, Trustee, Plaintiff,**

**v.**

**LAKE VIEW TRUST AND SAVINGS BANK, Defendant.**

**Bankruptcy No. 74 B 4754.**

United States Bankruptcy Court, N. D. Illinois, E. D.

Dec. 7, 1979.

Sanford J. Green, Chicago, Ill., for bankrupt Donald F. Schroud.

Barry J. Freeman, Freeman, Atkins & Coleman Ltd., Chicago, Ill., for trustee Allan R. Cohen.

Victor L. Lewis, Marian C. Haney, Philip J. Collora, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., Peter B. Harrison, O'Toole, Westrick & Harrison, Chicago, Ill., for defendant Lake View Trust and Savings Bank.

## MEMORANDUM OPINION AND ORDER

FREDERICK J. HERTZ, Bankruptcy Judge.

The plaintiff, trustee of the estate of the bankrupt, Donald Schroud, filed his adversary proceeding under the Bankruptcy Act of 1898, as amended, to recover losses sustained by the bankrupt arising from certain stock transactions. Defendant, Lake View Bank, loaned Schroud the funds used in these transactions, allegedly in violation of Federal Reserve Regulation U. (12 C.F.R. § 221 et seq.)

Defendant filed a motion to dismiss the complaint for failure to state a cause of action upon which relief could be granted. This motion was denied and defendant appealed to the District Court. The District Court granted plaintiff's motion to dismiss the appeal on the grounds that the Bankruptcy Judge's denial of the motion to dismiss was an interlocutory order and not finally dispositive of the rights of the parties. Under these circumstances the District Court, in its discretion, declined to review the Bankruptcy Court's order.

The Bank then filed its answer and its counterclaim against Schroud consisting of

a Complaint for Determination of Dischargeability under § 17(a) of the Act. By stipulation of the parties the two actions were consolidated for the purposes of orderly administration.

Extensive discovery and pretrial conferences were held followed by 11 trial sessions. The parties have submitted briefs in support of their respective positions and have had extensive oral argument.

It appears that this is a case of first impression.

## I

The business relationship between Schroud and the defendant originated some time in 1971. Schroud had operated several nursing homes in Wisconsin with his father, and later two pizza restaurants in Illinois. It was in the course of these transactions that he became acquainted with the defendant bank and its vice presidents, James DeNaut and Joseph Monahan. DeNaut had been with the bank for a number of years and had been the officer assigned to Schroud's account. DeNaut and Schroud had a social as well as business relationship.

Schroud had become known to the defendant as a well-educated, ambitious, young entrepreneur, who first commenced securities purchases about 1964, when he was a student at the University of Wisconsin. Between 1964 and 1969 Schroud had purchased approximately $25,000 to $50,000 worth of sundry securities and between 1969 and 1971 a similar amount. As a result of the sale of his interest in the nursing homes to Cenco, Schroud received a substantial amount of Cenco stock, which was the principal part of his portfolio.

On January 1, 1972 Schroud went to work as an account executive for Merrill Lynch, Pierce, Fenner and Smith, Inc. at a salary of $12,000 per year. He remained there at that salary until July 1, 1974.

Schroud had borrowed from the defendant bank on a number of occasions, and had always fulfilled his promises and cooperated with the bank regarding their directions concerning his loans. In the context of these dealings, Schroud, DeNaut and Joseph Monahan (DeNaut's predecessor at the bank) developed a close business relationship placing trust and reliance in each other. The bank viewed Schroud as a sound young man with profitable loan business to bring to the bank. Monahan, and subsequently DeNaut, acted as Schroud's seniors in the business world, his bankers and financial counselors. There developed a fiduciary type relationship between Schroud and his bankers.

## II

On September 13, 1972 defendant bank loaned Donald F. Schroud $259,933, secured by "sundry securities" with a market value of approximately $608,000. The acknowledged purpose of the loan was to trade in securities listed on the New York Stock Exchange and other national exchanges. The bank's DeNaut knew that this loan was a so-called "purpose" loan and therefore was covered by the requirements of the Federal Reserve Regulation U. As a result, a slightly higher rate of interest was charged in order to compensate for the higher cost of policing the account.

DeNaut and Schroud had discussed the effects of Regulation U before the loan was made. DeNaut believed that Regulation U would be satisfied if the transactions occurred on the same day and the stock purchased by Schroud had value equal to the stock sold. DeNaut did not consult his superiors at the bank nor its counsel with respect to this procedure. His view was that stock in the collateral account could be removed and new stock certificates entered into the account without having to reduce the principal amount on the loan as long as the substituted stocks had an equal value as the removed stock and the transactions occurred on the same day.

Schroud believed that the loan was one regulated by Regulation U and relied upon DeNaut to insure compliance with the federal regulations. Schroud's principal concern was that he be allowed to make the contemplated trades on his own account at Merrill Lynch because he was a new broker

and as a result, his volume of activity was periodically reviewed. This practice of trading on his own account would serve to increase the activity in the account and thus improve his standing at Merrill Lynch.

The close relationship between the plaintiff and the defendant must also be considered in the light of the economic circumstances prevailing at the time. Both parties were caught up in the steadily increasing "bull" market of the late 1960s and early 1970s. They had every reason to believe that the investments made by Schroud would continue to appreciate and therefore, there was little danger of loss associated with the loan. In any event, the bank did not monitor the value of the collateral sufficiently to insure compliance with the regulation at any time.

When the "bear" market arrived and the market began to fall, both Schroud and the bank (as well as the general public), continued to believe in a market recovery. Eventually the value of the collateral fell such that the bank made demand upon Schroud for payment of the note or liquidation of its collateral. DeNaut testified that the only thing that the bank actually cared about was that the loan never exceed 80% of the value of the collateral. This was the only margin requirement ever imposed by the bank. In fact, the margin requirements set by the regulations were never a concern for the bank. During the period of time in question, the maximum loan value of the collateral varied from 25% to 50%. The bank did not follow its own practice of requiring a ratio of 80% loan to collateral. DeNaut testified that it was not until the loan was actually "under water" (i. e., the balance of the loan exceeded the market value of the collateral) that demand was made on Schroud. The result was that when Schroud finally completed the liquidation of the bank's collateral, a balance of $76,670.44 remained unpaid. It is this amount that the bank seeks in its counterclaim for a judgment which is allegedly non-dischargeable.

On July 14, 1974 Schroud filed his bankruptcy petition and listed Lake View Trust and Savings Bank as a secured creditor with its claim in the amount of $100,000.00. In addition, First National Bank of Arcola, which maintained a close banking relationship with Lake View, was listed as an unsecured creditor with a claim of $41,799.22. The schedules indicate only these two creditors.

Subsequently, Allan R. Cohen was appointed trustee on October 15, 1974 and pursuant to Court order this litigation was commenced.

### III

Section 7(d) of the Securities and Exchange Act (15 U.S.C. § 78g(d)) provides:

It shall be unlawful for any person . . . to extend or maintain credit or to arrange for the extension or maintenance of credit for the purpose of purchasing or carrying any security, in contravention of such rules and regulations as the Board of Governors of the Federal Reserve System shall prescribe . . . .

Regulation U governs the extension of credit by a bank which is secured by securities and the purpose of the credit is the purchasing of margin stocks (text of Regulation U is reproduced in the appendix).

Whether a private cause of action arises in favor of an investor, injured as a result of the violation of the act, has produced a variety of views. Some courts have found that such a private cause of action does exist. (*Landry v. Hemphill, Noyes & Co.,* 473 F.2d 365 (C.A. 1, 1973), *cert. den.,* 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237, *reh. den.* 415 U.S. 960, 94 S.Ct. 1492, 39 L.Ed.2d 576 (1974); *Naftalin & Co. v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 469 F.2d 1166 (C.A. 8, 1972); *Goldman v. Bank of Commonwealth,* 467 F.2d 439 (C.A. 6, 1972); *Pearlstein v. Scudder & German,* 429 F.2d 1136 (C.A. 2, 1970), *cert. den. Scudder & German v. Pearlstein,* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971), and on remand, *Pearlstein v. Scudder & German,* 335 F.Supp. 83 (S.D.N.Y., 1971), and 346 F.Supp. 443 (S.D.N.Y., 1972), *rev'd on other grounds, Pearlstein v. Scudder & German,* 527 F.2d 1141 (C.A. 2, 1975), and numerous

District Court cases). On the other hand, some courts have not found such a cause of action. (*Utah State University of Agriculture and Applied Science v. Bear Stearns and Co. et al.,* 549 F.2d 164 (C.A. 10, 1977), *cert. den.,* 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977), and several District Court cases).

The Seventh Circuit has not ruled on the question. The District Court for the Northern District of Illinois has not agreed on the question. (See: *Neill v. David A. Noyes & Company,* 416 F.Supp. 78 (N.D.Ill., 1976), in favor of such a cause of action and *Tucker v. Janota* (unpublished No. 75 C 2931, N.D. Ill., November 1, 1978), which found no private cause of action.)

■ This court finds that the facts of this case strongly support a cause of action in favor of its Trustee in bankruptcy, a quasi-public official, seeking to enforce statutory rights.

Defendant bank cites *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which enumerated four factors which should be considered in considering the question. These are: (1) whether plaintiff is one of a class for whose "especial" benefit the statute was enacted; (2) whether there is any indication of legislative intent to create or deny such a remedy; (3) whether such a cause of action is consistent with the purpose of the legislative scheme, and (4) whether the cause of action is one traditionally relegated to state law.

However, the traditional concepts of statutory interpretation do still apply. See *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). It is particularly significant in this case that this action is brought by the trustee in bankruptcy for the benefit of creditors, and not by the injured investor, the bankrupt.

Here the bank claims to be an innocent injured party. There is no question that it has been injured, but surely it is not purely innocent. The facts show not only wanton disregard for the regulation and the margin requirements, but also that the bank undertook to honor the loan and the full value of the collateral in spite of the regulation. In fact, the bank charged a higher rate of interest specifically because of such additional efforts which it believed were required to monitor the loan to the bankrupt.

■ By way of defense, the bank has asserted the doctrine of *in pari delicto* to deny the right of action to an investor joining in the violation. The application of this doctrine presupposes that the parties stand on equal footing. The facts in this case disclose the contrary. The bank and its officers were experienced in their field and so held themselves out to Schroud as his advisors and counselors. On the other hand, young Schroud was an unsophisticated businessman who commenced these securities transactions on margin account in reliance upon his bankers. In this context, the relationship between the parties approaches that of a type of fiduciary relationship. As such the bankrupt placed extraordinary reliance upon the bank's representations as to its actions in connection with the margin requirements. Therefore, application of such a defense of *in pari delicto* is not appropriate in this case since the parties were not equal.

A consideration of the *Cort v. Ash* factors also indicates that implication of a private right of action is consistent with the legislative scheme involved. The first factor, that of a special benefit, while not clearly in support of such a private action, does lend strength to the position that there is such a right. The report of the House Committee stated:

> [t]he main purpose of the margin provisions . . . is not to increase the safety of security loans for lenders . . . nor is the main purpose even protection of the small speculator . . . *although such a result will be achieved as a by-product of the main purpose.* H.R. Rep. No. 1383, 73d Cong. 2d Sess. 8 (1934). [Emphasis added].

Thus it is significant that the House acknowledged that protection of the private investor or small speculator would be consistent as a by-product of the legislation.

The first factor parallels the second factor when considered in light of the aforementioned House Report. The third factor, consistency with legislative scheme, does indeed support the implication of a private right of action. Affording the innocent Trustee the possibility of recovery for losses sustained by the bankrupt estate, as a result of a violation of the act, will certainly aid in the enforcement of these regulations. While the Federal Reserve Board and other federal regulatory agencies have the power to investigate into the loan portfolios held by banks, the actual prospects for policing such margin requirements on every loan affected by the regulation, is impractical. These loans are precisely the type subject to regulation because of their relatively small amount and limited recovery in relation to a much larger regulatory scheme. These matters tend to receive a lower priority in enforcement and therefore, a private right of action is consistent with the legislative scheme.

The fourth factor is that imposition of the private right of action must be consistent with state law. This is surely the case in considering the very limited role that states have historically taken in policing and regulating banks, securities markets and the national economy.

The defendant bank urges that the respective rights of the parties should be determined by state law. However, when the purpose of the legislation is to insure a stable money market and securities industry, it is entirely appropriate that an injured party have access to the Federal Court for redress of such grievances and not be relegated to a state remedy. Further, this is particularly appropriate in a bankruptcy setting where the Trustee represents the creditors.

The imposition of a private cause of action has been criticized on the ground that the result is that the lender insures that the speculating borrower suffers no losses. Practically, however, the lender can be protected against loss to the speculating borrower when the lender conforms to the requirements of the statute. In such a situation the lender himself holds the sword that does the damage; he only pays when *he* violates the Act and Regulations. Thus, the imposition of this private cause of action acts as a penalty to a lender for violating the Act and is not a windfall to the errant investor.

Defendant argues that the subsequent enactment in 1970 of Section 7(f) to the Act serves to deny implication of such private right of action because the investor himself was now covered. Section 7(f) and Regulation X do not apply in this case since the motivation in passing Section 7(f) was to control the infusion of foreign credit which historically had been exempt from regulation and did not deal with the investor who borrowed money from an already regulated entity.

Here the actions of the bank in ignoring the requirements of the regulation operated to fuel the very type of speculation in the securities market which Congress sought to regulate because of its perceived debilitating effect on the economy.

The language of Regulation U and Section 7(d) are explicit. "No bank shall" lend money in violation of the regulations. The malum prohibitum nature of the statute clearly distinguishes it from the statutes at issue in *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). The statutes there "simply require certain regulated businesses to keep records and file periodic reports" so that certain regulatory functions could be performed. 442 U.S. 569, 99 S.Ct. 2486. This is a very different requirement than that of Regulation U where specific conduct is proscribed. The Supreme Court in *Touche Ross* acknowledged that a private right of action has been implied in many cases involving the prohibition of certain conduct. *Id.*

Turning to the question of the counter-claim by the bank against the bankrupt which takes the form of its complaint objecting to the discharge of the debt and for judgment thereon, such counter-claim must be denied and the claim for participation in the distribution of the estate disallowed. Section 29(b) of the Act (15 U.S.C. § 78cc(b)) provides that:

. . . [e]very contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the right of any person who, in violation of any such provision, rule or regulation, shall have made or engaged in the performance of any such contract . . .

Under this section contracts made in violation of the regulations are voidable at the option of the non-violating party. *Daley v. Capital Bank & Trust Co.*, 506 F.2d 1375 (C.A. 1, 1974); *Wood v. Reznik*, 248 F.2d 549 (C.A. 7, 1957); *Guarantee Ins. Agency Co. v. Mid-Continental Realty Corp.*, 57 F.R.D. 555 (N.D.Ill., 1972).

█ The loan contract between Schroud and the bank involved the continuance of a practice which violated Regulation U and contravened the purpose for which Section 7 and Regulation U were enacted. When the lender sues the borrower to enforce such a contract, the borrower may set up the lender's violation of the regulation as a defense. *Freeman v. Marine Midland Bank of New York*, 419 F.Supp. 440 (E.D.N.Y., 1976).

By clear and convincing evidence the plaintiff has established as the bankrupt's defense the bank's violation of Regulation U.

The three transactions involved in this case violated the margin requirements and/or same day transaction requirements. Therefore, the bank cannot recover a deficiency on a contract which has been held void under Section 29(b). *Goldman v. Bank of the Commonwealth*, 467 F.2d 439, 446 (C.A. 6, 1972); *Greater Iowa Corp. v. McLendon*, 378 F.2d 783, 792 (C.A. 8, 1967); *Royal Air Properties, Inc. v. Smith*, 312 F.2d 210, 213 (C.A. 9, 1962).

█ In this case, the bank's violation of Regulation U is a proper bar to its counter-claim as well as its claim for participation in the distribution of the assets of the bankrupt. The transactions involving the First National Bank of Arcola are not involved in this litigation, and its claim for participation in any distribution is not effected by this decision.

It is significant to note that the Lake View Bank's extension of credit here actually encouraged speculation. Schroud. acknowledged to the bank that the purpose of the loan was for purchasing and selling stock on margin. As a youthful broker he would hardly have been extended a line of credit in excess of $250,000 through the usual banking channels.

With respect to the counter-claim of the bank objecting to the discharge of Schroud's loan, such complaint must be dismissed because of the bank's failure to meet the specific burden of proof required under Section 17 of the Bankruptcy Act.

██ The essence of the bank's objection under Section 17a(2) is that Schroud falsely misrepresented his intentions with respect to his sale of certain Fairchild stock held by the bank as collateral for the loan. The property which the bank alleges that Schroud obtained consists of an extension of time given by the bank to Schroud in which he could liquidate the Fairchild Camera stock. It is the bank's contention that Schroud never intended to sell the Fairchild stock at any time and that the bank relied upon Schroud's representations that he did in fact have such an intent. The bank has set forth insufficient proof to support its allegation of such a false representation. The burden of proof is upon the creditor who claims that his duly scheduled debt is excepted from the operation of the discharge in bankruptcy because of the false representation or pretense. *Rice v. Matthews*, 342 F.2d 301 (C.A. 5, 1965); *In re Molden*, 300 F.2d 5 (C.A. 7, 1962). See also 1A Collier on Bankruptcy, 14th Ed. ¶ 17.16 at 1648.

Here the bank did not offer any evidence to demonstrate Schroud's state of mind vis-a-vis his intention to sell the stock at the time that he executed the agreement with

**590**

the bank. There is no evidence that Schroud never intended to sell the Fairchild Camera stock. The facts show that Schroud had every reason to believe that he would be in a position to sell the Fairchild Camera stock at the time that he agreed to the stop loss order. It was only due to the unforeseen loss or disappearance of the stock certificate that the stop loss order could not be executed timely. The mere fact that Schroud represented that he intended to liquidate the collateral on a certain date and subsequently failed to do so on that date, does not give rise to a false representation. *In re Taylor,* 514 F.2d 1370 (C.A. 9, 1975); *In re Dolnick,* 374 F.Supp. 84 (N.D. Ill., 1974); *In re Sewell,* 361 F.Supp. 516 (S.D. Ga., 1973); *In re Adams,* 368 F.Supp. 80 (D. S.D., 1973). See also 1A Collier on Bankruptcy, 14th Ed. ¶ 17.16, at 1638–1639.

## IV

As a result of the bank's failure to comply with Regulation U, this court finds that the plaintiff Trustee in bankruptcy has sustained monetary damages in the amount of $84,005.

Plaintiff has met his burden of establishing the causal relationship between the bank's failure to comply with the regulation and the damages sustained by the estate.

Plaintiff has described adequately the three transactions at issue and the manner in which the bank violated the requirements of the regulation. The facts reveal convincingly that the non-compliance by the experienced bankers created a situation in which a relatively inexperienced, eager young man was allowed to have the use of funds with which to purchase additional stock at a time when these very same funds should have been used to reduce the large sums of money outstanding on his loans. In certain circumstances the bank had the cash proceeds of the sale which they could have transferred to the loan account, thereby reducing the indebtedness in accordance with the requirements of the regulation. Instead of reducing the loan properly the bank either allowed Schroud to purchase

securities with these proceeds or they transferred part of the proceeds from the sales to Schroud's personal checking account. This non-compliance in addition injured the estate to the extent that Schroud was required to pay interest on larger sums outstanding on the loan. These interest charges would have been reduced had the principal been reduced in accordance with the regulations.

Damages have been computed here using the method employed in *Grove v. First National Bank of Herminie,* 489 F.2d 512 (C.A. 3, 1973). That method used the decline in the value of the registered stock pledged by the investor from the date on which the stock was pledged, until the date on which the stock was sold as the measure of damages.

The facts reveal that Schroud would not have been able to complete the subsequent purchase of new stock, had the proper reduction in credit been effected in each of the three transactions at issue. These three transactions and the value of the collateral and the amount outstanding on the loan were stipulated by the parties. (See attached Appendix)

The measure of damages in the *Grove* case included the decline in value of *all* of the securities in the collateral account due to the fact that the loan was in violation of Regulation U from its inception. The Court feels it appropriate to limit the measure of damages in this case to the decline in value of the stock purchased with funds which should have been used to reduce Schroud's indebtedness. This modification of the *Grove* standard is proper because the parties have stipulated that only these three transactions are at issue. In addition, if the principal amount had been reduced in accordance with the regulation instead of new stock purchased, the value of the rest of the collateral held by the bank would have continued to decline at a time of compliance with Regulation U. Recovery for the decline of the value of this portion of the collateral account would constitute a windfall to plaintiff and therefore not recoverable.

On May 9, 1973 the first transaction which violated Regulation U occurred as described in paragraph 6(a) of the stipulation between the parties. Three-thousand shares of Hughes Tool were withdrawn and sold from the collateral account at a price of $153,000 and 1,000 shares of Searle and Bausch & Lomb were purchased and substituted at $141,625. These transactions also occurred on May 9, 1973. At this time the "equity ratio" was 41.97% and was in excess of the minimum equity ratio of 40% as prescribed in Regulation U. (12 C.F.R. § 221.4(f)). This withdrawal and substitution constituted a valid same day transaction as provided for in Section 221.1(c)(1). However, Section 221.1(c)(1)(i) required that the credit be reduced by $7,962.50, the difference in retention requirements between the collateral withdrawn and the collateral substituted. The bank did not reduce the loan by this amount and therefore was in violation of Regulation U. In this transaction the measure of damages is the decline in value of the Searle and Bausch & Lomb stock on the date pledged to the date of sale, i. e., $141,625 – $92,320 = $49,305 (see stipulation, page 4).

The second transaction in which Regulation U was violated involved 2,000 shares of Bausch & Lomb, which were withdrawn and sold from the collateral account at $66,750 on August 6, 1973 and 100 shares of Searle and 3,100 shares of Wickes which were purchased and substituted at $57,412 on August 7, 1973. The equity ratio was below 40% and therefore below the minimum equity ratio specified in Section 221.4. The same day transaction rule did not apply in this case. Instead Section 221.1(b)(2) should have been followed. Under these circumstances, the loan should have been reduced by the difference between the retention requirement of the collateral withdrawn and the maximum loan value of the collateral substituted ($66,750 collateral sold × 70% retention = $46,725; loan value of collateral substituted = 35% × $57,412 = $20,094.20; $46,725 – $20,094.20 = $26,630.80). The bank did not reduce the loan by $26,630.80 and again violated Regulation U. The decline in value of the sale of Searle and Wickes stock was $7,825 ($57,412.50 – $49,587.50 = $7,825).

The third transaction began with the withdrawal and sale of 5,000 shares of CMI on March 22, 1974 at a price of $112,500. Both the bank and Schroud understood that the proceeds from this sale would be used to purchase additional stock which would be pledged to the bank as collateral. However, the purchase of any new stock did not take place on March 22, 1974. In fact, prior to the purchase of any stock, a certificate of deposit was purchased from the defendant bank with these proceeds. Both the bank and Schroud understood that the proceeds from the certificate of deposit would be used to purchase new stock.

Subsequently, on April 16, 1974, almost one month later, 2,000 shares of Fairchild Camera stock were purchased at a price of $105,635. The loan issued by the bank for the purchase of these securities was secured by the certificate of deposit. That loan was repaid on May 11, 1974 when the certificate of deposit matured.

Whether these transactions are viewed as a dual transaction or a single event does not change the fact that the bank violated Regulation U by failing to reduce the loan. Certainly it cannot be argued that this was a same day transaction. If viewed as a dual transaction, Section 221.1(b)(2) requires that after withdrawal and sale of the CMI stock, the loan should have been reduced by $78,750. The dual transaction theory assumes that no collateral was substituted and therefore the loan should have been reduced by 70% of the amount realized, namely, the retention requirement of the withdrawn collateral.

The single event theory views the withdrawal and sale of the CMI stock and the purchase and substitution of the Fairchild Camera stock as one transaction. Even if this view of the transaction is accepted, Section 221.1(b)(2) would have required that the loan be reduced by $25,932.50 (the dif-

ference between the retention requirement of the collateral withdrawn, $78,750, and the maximum loan value of the substituted collateral, $52,817.50). The loan was never reduced by either amount $78,750 or $25,-932.50. Consequently, a violation of Regulation U by the bank occurred regardless of the theory employed.

Ordinarily, as in the other two transactions, the measure of damages would be the difference between the value of the Fairchild Camera stock when pledged, $104,875, and the value of the stock when sold, $66,-725, or $38,150. However, the bank directed Schroud to sell the Fairchild Camera stock at $39 per share when the stock would have sold at $78,000. That Schroud did not sell at the $39 per share price was through no fault of the bank but rather due to Schroud's inability to locate the stock certificate. Therefore the bank should not be held responsible for any decline in the value of the Fairchild Camera stock below $39 per share. The measure of damages therefore is the difference between the value of the stock when pledged, $104,875, and the value of the stock when sold at the $39 per share price, or $78,000, resulting in a loss of $26,-875. The total amount of the damages from these three transactions is $84,005 ($49,305 plus $7,825 plus $26,875).

### V

ACCORDINGLY, IT IS HEREBY ORDERED that judgment in favor of plaintiff Trustee and against defendant Lake View Trust and Savings Bank shall be entered in the amount of $84,005, together with the plaintiff's costs. Interest is allowed from the date of filing of this action. The counter-claim of defendant Lake View Trust and Savings Bank against the bankrupt, Donald F. Schroud, objecting to the discharge of its debt is denied. In addition, the claim of Lake View Trust and Savings Bank for participation in distribution of the assets of the estate is disallowed.

Counsel for the Trustee shall submit a form of judgment consistent with this order within ten days.

### APPENDIX A

#### § 221.1 General rule.

(a) *Purpose credit secured by stock.* (1) Except as provided in subparagraph (2) of this paragraph (a) and in § 221.3(q) no bank shall extend any credit secured directly or indirectly by any stock for the purpose of purchasing or carrying any margin stock in an amount exceeding the maximum loan value of the collateral, as prescribed from time to time for stocks in § 221.4 (the Supplement to Regulation U) and as determined by the bank in good faith for credit subject to § 221.3(s) for any collateral other than stocks: *Provided,* That unless held as collateral for such credit on October 20, 1967, and continuously thereafter, any collateral other than stock shall have loan value for the purpose of this part only as collateral for a credit which is not secured by stock, as described in § 221.3(s), and any collateral consisting of convertible debt securities described in § 221.3(t) shall have loan value only for the purpose of that section, and not for other credit subject to this part.

(2) Credit extended prior to July 8, 1969, for the purpose of purchasing or carrying any OTC margin stock or any debt security convertible into such stock (and no other margin stock) is not purpose credit, except that with respect to any OTC margin stock such date shall be August 7, 1969, if extended to a member of a national securities exchange or a broker or dealer registered under section 15 of the Securities Exchange Act of 1934 (15 U.S.C. 78o).

(b) *Substitutions and withdrawals.* Except as permitted in paragraph (c) of this section, while a bank maintains any credit subject to this part, whenever extended, the bank shall not at any time permit any withdrawal or substitution of collateral unless either (1) the credit would not exceed the maximum loan value of the collateral after such withdrawal or substitution, or (2) the credit is reduced by at least the amount by which the maximum loan value of any collateral deposited is less than the "retention requirement" of any collateral withdrawn.

The "retention requirement" of collateral other than stock is the same as its maximum loan value and the "retention requirement" of collateral consisting of stock is prescribed from time to time in § 221.4 (the Supplement to Regulation U).

(c) *Same-day transactions.* (1) Except as provided in § 221.3(r)(1), a bank may in the case of a credit in which the equity ratio is equal to or exceeds the minimum equity ratio as prescribed in § 221.4 (the supplement to the regulation) permit a substitution of stock whether margin or non-margin, effected by a purchase and sale on orders executed within the same day: *Provided,* That (i) if the proceeds of the sale exceed the total cost of the purchase, the credit is reduced by at least an amount equal to the "retention requirement" with respect to the sale less the "retention requirement" with respect to the purchase, or (ii) if the total cost of the purchase exceeds the proceeds of the sale, the credit may be increased by an amount no greater than the maximum loan value of the stock purchased less the maximum loan value of the stock sold. If the maximum loan value of the collateral securing the credit has become less than the amount of the credit, the amount of the credit may nonetheless be increased if there is provided additional collateral having maximum loan value at least equal to the amount of the increase.

(2) For the purpose of this paragraph, the term "equity ratio" means the fraction (stated as a percentage) in which the denominator is the current market value of the collateral having loan value in respect of the credit and the numerator is such current market value minus the amount of the credit currently owing.

(d) *Single credit rule.* For the purpose of this part, except for credit subject to § 221.3(s) or (t), the entire amount of the purpose credit extended to any customer by any bank at any time shall be considered a single credit; and all the collateral securing such credit shall be considered in determining whether or not the credit complies with this part.

[Reg. U, 34 FR 9204, June 11, 1969; 34 FR 9984, June 28, 1969, as amended at 37 FR 13974, July 15, 1972]

## APPENDIX B

### STIPULATION

The parties hereby stipulate and agree, through their respective counsel, that:

(1) During the period in which the transactions alleged in the Complaint, and prior thereto, and in particular from 5/9/73 and through July of 1974, the Lake View Trust and Savings Bank was an Illinois banking corporation engaged in the business of commercial lending, including the making of loans to individuals that were regulated under the provisions of the Securities and Exchange Act of 1934, 15 U.S.C.A. 78a, et seq., the Federal Reserve Board Regulations promulgated thereunder, and Donald F. Schroud was a licensed securities broker employed by the brokerage firm of Merrill Lynch, Pierce, Fenner & Smith, Inc., in which capacity he actively traded in the national securities markets both for himself and for customers;

(2) During the aforesaid period the Lake View Trust and Savings Bank had a loan outstanding to Donald F. Schroud for $259,933.00, secured by "sundry securities" for the purpose of trading in his own securities on his own behalf on the national securities markets, and that said loan was evidenced by the secured demand promissory note of said Donald F. Schroud to said bank, dated September 13, 1972, in the principal amount of $259,933.00, a copy of which is attached hereto, and marked Exhibit "A";

(3) During the aforesaid period said Donald F. Schroud did from time to time withdraw from the bank certain securities then held by the bank as collateral for said loan, sell said securities primarily through his

own account at said Merrill Lynch, Pierce, Fenner & Smith, Inc., and also, to a lesser extent, through Kidder, Peabody & Co., another brokerage firm, and deliver to said bank other securities to be held by the bank as additional collateral for said loan;

(4) During the aforesaid period and transactions both the bank and Donald F. Schroud knew or should have known that said loan and all subsequent transactions related thereto, were regulated under the provisions of the Securities and Exchange Act of 1934, 15 U.S.C.A. 78a, et seq., and the Federal Reserve Board Regulations promulgated thereunder; and that said Donald F. Schroud's loan account at the bank was "restricted" under the aforesaid Federal Reserve Board Regulations.

(5) During the transactions alleged in the Complaint herein of Donald F. Schroud for the period 5–9–73 through 12–31–73 the maximum loan value of the stocks then held as collateral by the bank, as aforesaid, as prescribed by the Federal Reserve Board under Regulation U was 35% of their current market value as determined by any reasonable method, and for the period of 1–1–74 through July, 1974, the said maximum loan value was 50%; further, the minimum equity ratio for all transactions alleged in the Complaint was 40%;

(6) The market value of the total stock collateral held, that withdrawn, that sold, and that purchased in the transactions alleged in plaintiff's Complaint are as follows:

(A) Status of Account as of Beginning of 5–9–73:

| | | | | | |
|---|---|---|---|---|---|
| 1,000 shares | Bausch & Lomb | at | $ 22-¾ = | $ 22,750.00 |
| 13,106 shares | Cenco | " | 15-¾ = | 206,419.50 |
| 3,000 shares | Hughes Tool | " | 50-¾ = | 152,250.00 |
| 400 shares | Wickes | " | 19 = | 7,600.00 |
| 1,000 shares | Winnebago | " | 9-½ = | 9,500.00 |
| 3,000 shares | Rockaway | " | 12-¼ = | 36,750.00 |
| 1,500 shares | McCullock Oil | " | 8-⅜ = | 12,712.50 |
| | | | Total | $447,982.00 |

(Max. Loan Val., 35% = $156,793.70)

Collateral Sold on 5–9–73 and Withdrawn on 5–11–73:

| | Selling Price per Share | Total Proceeds of Sale |
|---|---|---|
| 3,000 shares Hughes tool | $ 51 | $153,000.00 |

(1500 Hughes Tool purchased on 3–8–73 = $71,250, and 1500 Hughes Tool purchased on 3–8–73 = $70,875, Total = $142,125.00)

Collateral Purchased 5–9–73 and Registered in the Collateral Register on 5–22–73:

| | Purchase Price | Total |
|---|---|---|
| 1,000 shares G. D. Searle | 117-⅝ | $117,625.00 |
| 1,000 shares Bausch & Lomb | 24 | 24,000.00 |

Eventual Selling Price of Collateral Purchased on 5/9/73:

| | |
|---|---|
| 1,000 shares Searle | $ 58,945.21 |
| 1,000 shares Bausch & Lomb | 33,375.00 |

(B) Status of Account as of Beginning of 8–6–73:

| | | | | | |
|---|---|---|---|---|---|
| 2,000 shares | Bausch & Lomb | at | $33-½ | = | $ 67,000.00 |
| 13,106 shares | Cenco | at | 15 | = | 196,590.00 |
| 1,500 shares | McCulloch Oil | at | 5-½ | = | 8,250.00 |
| 3,000 shares | Rockaway | at | 11 | = | 33,000.00 |
| 400 shares | Wickes | at | 18 | = | 7,200.00 |
| 1,000 shares | Winnebago | at | 7-⅛ | = | 7,125.00 |
| 3,000 shares | Searle | at | 36 | = | 108,000.00 |
| | | | Total | | $427,165.00 |

(Max. Loan Val., 35% = $149,507.75)

Collateral Sold on 8–6–73:

| | Selling Price | Total |
|---|---|---|
| 2,000 shares  Bausch & Lomb | $33-⅜ | $ 66,750.00 |

(1,000 purchased 5–9–73 and 1,000 purchased 9–6–72 for a total of $57,500.00)

Collateral Withdrawn on 8–8–73:

| | Closing Price as Reported in Wall Street Journal on 8–8–73 | |
|---|---|---|
| 2,000 shares  Bausch & Lomb | $32-⅛ | Total $ 64,250.00 |

Collateral Purchased on 8–7–73 and Recorded in the Collateral Register on 8–9–73:

| | Purchase Price | Total |
|---|---|---|
| 100 shares  G. D. Searle | $35-½ = | $ 3,550.00 |
| 3,000 shares  Wickes | 17-⅜ = | 52,125.00 |
| 100 shares  Wickes | 17-⅜ = | 1,737.50 |
| | | $ 57,412.50 |

Eventual Selling Price of Collateral Purchased on 8–7–73:

| | | Total |
|---|---|---|
| 100 shares  G. D. Searle | = | $ 1,537.50 |
| 3,100 shares  Wickes | = | 48,050.00 |
| | Total | $ 49,587.50 |

(C) It is agreed that the allegations of Paragraph 7, and subparagraphs thereof, are dropped.

(D) Status of Account as of 3–22–74:

| | |
|---|---|
| 13,106 shares Cenco | $185,122.25 |
| 2,000 shares G. D. Searle | 52,750.00 |
| 5,000 shares CMI | 112,500.00 |
| 900 CMI Warrants | 8,775.00 |
| Total | $359,147.25 |

(Max. Loan Val., 50% = $179,573.62)

| | |
|---|---|
| 5,000 shares CMI sold 3–22–74 withdrawn from bank on 3–27–74 | $112,500.00 |

The closing quotation for CMI as reported in the Wall Street Journal on 3–27–74 was 21½ per share. (5,000 shares CMI were purchased on 10–31–73 for $105,000.00)

From CMI sale proceeds $110,000.00 was deposited in savings at defendant bank and Certificate of Deposit was placed as collateral to Schroud's credit.

At the time of the sale of the CMI shares, Schroud represented to the bank that it was his intention to use the proceeds of sale to purchase other stock which in turn would be pledged with the bank, however, he had not determined what stock he wished to purchase. In view of the foregoing the bank advised Schroud to use the proceeds of sale to purchase a Certificate of Deposit which would be pledged with the bank, pending his decision as to which stock he would eventually purchase and pledge with the bank. The proceeds of the Certificate of Deposit were to be used to purchase such new stock which in turn was to be substituted for the Certificate of Deposit in the account.

On 4–16–74 Schroud purchased 2,000 shares Fairchild Camera for $104,875.00 (gross 105,635).

Defendant bank on 4–22–74 loaned Schroud an additional $105,635.00 to purchase said stock secured by the Certificate of Deposit which certificate was due 5–12–74. This loan was evidenced by a new note in said amount. This loan was repaid with funds from Certificate of Deposit when they could be withdrawn without penalty on 5–11–74.

On 4–22–74 the principal amount of the loans outstanding to Schroud were $259,933.00 and $105,635.00. Total collateral on 4–22–74 on all loans (including 2,200 shares of Cenco added by request of bank for more collateral and the purchased Fairchild stock on 4–22–74, which Schroud had agreed to pledge) was:

| | |
|---|---|
| 2,200 shares Cenco | $ 26,675.00 |
| 13,106 shares Cenco | 158,910.25 |
| 2,000 shares G. D. Searle | 48,250.00 |
| 900 CMI Warrants | 11,025.00 |
| 2,000 shares Fairchild Camera | 106,750.00 |
| | $351,610.25 |
| Maximum Loan Value of Stock | $175,805.12 |
| Collateral Value of CD | 110,000.00 |
| Total Max. Loan Value of Collateral | $285,805.12 |

The Fairchild Camera Stock was eventually sold as follows:

| | |
|---|---|
| 1,100 shares | $ 36,575.00 |
| 900 shares | 30,150.00 |

(7) Donald F. Schroud, bankrupt, represented to the bank on January 15, 1973 that he would deposit a check for $13,000, and on December 22, 1971 Saundra Schroud, said bankrupt's wife, pledged her absolute personal guaranty, in the maximum amount of $20,000, of said bankrupt's indebtedness to the bank in relation to said loan account, but the parties hereto agree that the above two events do not change the agreed fact that the said loan account of bankrupt was restricted during the above transactions.

(8) In connection with the sales transactions referred to in this Stipulation which took place on May 9 and August 6, 1973 and March 22, 1974 such transactions were initiated by the bankrupt and he made all decisions with respect to which shares were to be sold, withdrawn and purchased.

(9) It is agreed by the parties to this Stipulation that nothing in this Stipulation should foreclose the offerings of proofs by either parties with respect to any additional evidence relevant to the matters in dispute in this litigation subject to the rules of evidence.

(s) Peter B. Harrison
Attorney for
LAKE VIEW TRUST AND SAVINGS
BANK

(s) Barry J. Freeman
Attorney for
ALLAN R. COHEN, Trustee

## EXHIBIT A

709 390 9  8883-3 | IR | DS | 10 | | |

125.8000

### SECURED DEMAND NOTE

Due Date _____ On Demand. _____ , 19 ____

No. _____ Chicago, Ill _____ September 13 , 19 72 _____ Amount $ 259, 933.00

ON DEMAND, the undersigned, (jointly and severally, if more than one), for value received, promise(s) to pay to the order of Lake View Trust and Savings Bank ___ TWO HUNDRED FIFTY NINE THOUSAND NINE HUNDRED THIRTY THREE AND 00/100 * * * ___ Dollars at its offices in Chicago, Illinois, together with interest thereon from the date hereof until paid at the rate of _Floating prime_ 3/4 over the prime rate _as of 8-3-75_ per cent per annum, computed on the basis of a 360 day year for the actual number of days elapsed, payable __quarterly__ , beginning the 30th day of November , 19 72 .

To secure payment of this Note and of all other liabilities of the undersigned (hereinafter called the "Maker") to the holder hereof, howsoever created, whether now existing or hereafter arising, whether direct or indirect, whether absolute or contingent, and whether due or to become due (this note and all such, other liabilities being hereafter called the "Obligations"), the Maker pledges to the Bank and grants to the Bank a security interest in the following property which' has been or is hereby delivered, pledged, assigned and transferred to the Bank.

_____ Sundry Securities _____

and any other property of every kind or description of the undersigned now or at any time hereafter assigned transferred or delivered to or left n the possession of the Bank or its agents by or for the account of the Maker, including, but without limitation, all property described in receipts for collateral from time to time issued by the Bank or its agents to or for the account of the Maker, and in all dividends and distributions on, other rights in connection with, and all substitutions for, such property (hereinafter called the "Collateral").

If the holder should at any time be of the opinion that the Collateral is not sufficient or has declined in value or should the holder deem itself insecure, then the holder may call for additional security satisfactory to the holder, and the Maker promises to furnish such additional security forthwith. The call for additional security may be oral or by telegram or by United States mail addressed to the last address for the Maker shown on the holder's records.

At the option of the holder, all Obligations shall become immediately due and payable without notice or demand, (1) should the holder deem itself insecure for any reason whatsoever, or (2) upon the occurrence of any of the following events of default:

(a) Failure of any Maker to pay, when due, any amount payable on any of the Obligations or to comply with or perform any of the agreements contained in this note; or

(b) Death, dissolution, termination of existence, insolvency, failure to pay debts as they mature, business failure, appointment of a receiver of any part of the property of, assignment for the benefit of creditors by, or the commencement of any proceedings under any bankruptcy or insolvency laws by or against, any Maker or any indorser or guarantor for any Maker.

Upon the occurrence of any such event of default, and at any time thereafter, the holder shall have the rights and remedies of a secured party under the Uniform Commercial Code of Illinois, including without limitation thereto, the right to sell or otherwise dispose of any or set of the Collateral. If any notification of intended disposition of any of the Collateral is required by law, such notification, if mailed, shall be deemed reasonably and properly given if mailed at least five days before any disposition, postage prepaid, addressed to the Maker, either at the address shown below, or at any other address of the Maker appearing on the records of the holder. Any proceeds of the disposition of any of the Collateral may be applied by the holder to the payment of reasonable expenses incurred in connection therewith, including reasonable attorneys' fees and legal expenses, and any balance of such proceeds may be applied by the holder toward the payment of such of the Obligations and in such order of application as the holder may from time to time elect.

The right is expressly granted to the holder at its option to transfer at any time into the name of the holder or its nominee any Collateral pledged hereunder, to thereafter exercise, at its option, all of the rights of a registered owner with respect thereto, including voting rights, and to receive the income on the Collateral and hold the same as security herefor, or apply it on the principal or interest, due hereon or due on any Obligation secured hereby.

At any time any deposit or other indebtedness credited by or due from the holder or any Maker may be set off against and applied in payment of any Obligations, whether due or not, and such deposits or other indebtedness may at all times be held and treated as collateral security for the payment of the Obligations.

The holder may at its option, whether or not this note is due, demand, sue for, collect, or make any compromise or settlement it deems desirable with reference to Collateral held hereunder. The holder shall not be bound to take any steps necessary to preserve any rights in the Collateral against prior parties, which the Maker hereby assumes to do.

No delay or omission on the part of the holder in exercising any right hereunder or under any other agreement pertaining to the Collateral shall operate as a waiver of such right or of any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any such right and/or remedy on any future occasion.

Every Maker, indorser and guarantor of this note, or the obligation represented hereby, expressly waives presentment, protest, demand, notice of dishonor or default, and notice of any kind with respect to this note or any guaranty of this note or the performance of the obligations under this note or any guaranty of this note. No renewal or extension of this note, whether or not longer than the original period, no release or surrender of any Collateral or other security for this note or any guaranty of this note, no release of any person, primarily or secondarily liable on this note (including any Maker, indorser or guarantor), no delay in the enforcement of payment of this note or any guaranty of this note, and no delay or omission in exercising any right or power under this note or any guaranty of this note shall affect the liability of any Maker, indorser or guarantor of this note.

Whenever an event of default exists Maker agrees to pay on demand all expenses of collection of this note and enforcement of rights under any of the Collateral, including reasonable attorneys' fees and legal expenses.

As herein used the word "holder" shall mean the payee or other indorsee of this note, who is in possession of it, or the bearer hereof, if the note is at the time payable to the bearer. As used herein the word "Maker" shall mean each of the undersigned.

Address ___ 100 E. Bellevue Apt. 25-B

x _Donald F. Schroud_
x Donald F. Schroud

SIGN HERE

Telephone Number : Chicago, Illinois  60611

## GUARANTY

FOR VALUE RECEIVED the undersigned (jointly and severally if more than one) hereby guarantee(s) absolutely and unconditionally prompt payment of the within Note and agree(s) to pay all costs of collection, legal expenses and attorneys' fees, incurred or paid by the holder of the within Note in the collection and/or enforcement of said Note and the enforcement of this Guaranty.

The undersigned grant(s) to the holder a security interest in all property of the undersigned now or at any time hereafter in the possession of the holder to secure the payment of any liability of the undersigned under this Guaranty and the holder shall have the rights and remedies of a secured party under the Uniform Commercial Code of Illinois in respect to such property, including without limitation thereto, the right to sell or otherwise dispose of any or all of such property. The holder may apply or set off any deposit or other indebtedness at any time credited by or due from the holder to any of the undersigned against any liability of the undersigned under this Guaranty, if said Note is not paid when due. Such deposits or other indebtedness may at all times be held and treated as collateral security for the payment of any liability of the undersigned under this Guaranty. No renewal or extension of said Note, whether or not longer than the original period, no release or surrender of any security for said Note or this Guaranty, no release of any person, primarily or secondarily liable on said Note (including any Maker, indorser or guarantor), no delay in the enforcement of payment, and no delay or omission in exercising any right or power under said Note or this Guaranty shall affect the liability of any of the undersigned hereunder. Each of the undersigned expressly waives presentment, protest, demand, notice of dishonor or default, notice of acceptance of this Guaranty and notice of any kind with respect to said Note or this Guaranty or the performance of the obligations under said Note or this Guaranty. Each of the undersigned consents to and agrees to be bound by all the terms and provisions of said Note.

| NOTE NO. | INTEREST | DATE | NAME | PAYMENT | BALANCE |
|---|---|---|---|---|---|
| 9-12-72 | 2519.73 | NOV 30 72 | | | |
| 11-30-72 | 1433.91 | MAR -1 73 | | | |
| 2-28-73 | 1049.42 | JUN -2 73 | | | |
| 5-31-73 | 1815.98 | AUG 31 73 | | | |
| 8-31-73 | 1945.91 | DEC -8 73 | ✓ credit charged | | |
| 10-10-73 | 3,032.55 | DEC -8 73 | | | |
| 10-30-73 | 1,552.38 | FEB -8 74 | | | |
| 11-30-73 | 2,350.23 | APR -8 74 | | | |
| 2-28-74 | 2,810.66 | MAY -6 74 | ✓ credit charged | | |
| | 2,823.29 | JUN -5 74 | | | |
| | | JUN -6 74 | 6,593.99 | 253,346.01 | by chk. |
| | | JUL 11 74 | 8,140.92 | 245,199.09 | by ck. |
| | | JUL 16 74 | 6,472.49 | 177,726.40 | by ck. |
| | | JUL 19 74 | 65,634.25 | 112,092.15 | by ck. |
| | | JUL 20 74 | 14,369.05 | 97,723.10 | by ck. |
| | | JUL 22 74 | 21,052.66 | 76,670.44 | by chk. |

FORMS FROM CORNELIUS & JOHNSON, INC., CHICAGO